**UNITED STATES v. ST. LOUIS DAIRY CO. et al.**

**Cr. No. 25713.**

District Court, E. D. Missouri, E. D.

May 14, 1948.

Drake Watson, U. S. Atty., of New London, Mo., George B. Haddock, Sp. Asst. to Atty. Gen., and John R. Niesley, Walter D. Murphy, and Joseph R. Cannon, Sp. Attys., Department of Justice, all of Washington, D. C., for plaintiff.

Jacob M. Lashly, of St. Louis, Mo., for defendants St. Louis Dairy Co., and Basil M. Lide.

James A. Finch of Cape Girardeau, Mo., and E. C. Hartman and William H. Allen, both of St. Louis, Mo., for defendants Pevely Dairy Company, Arthur Kerckhoff, Richard D. Kerckhoff, Elmer M. Kerckhoff, Daniel M. Kerckhoff, and Alexander Kerckhoff.

HULEN, District Judge.

Defendants, being charged by indictment with conspiracy to fix and stabilize prices of fluid milk, in restraint of interstate commerce in violation of the Sherman Act, 15 U.S.C.A., § 1, move to dismiss on grounds that the indictment does not plead facts showing (1) the conspiracy charged was in restraint of interstate commerce, and (2) the restraint described directly and substantially restrains interstate commerce.

The indictment in substance charges the corporate defendants have their principal place of business in St. Louis, Missouri, are engaged in purchasing fluid milk from producers, bottling, selling and distributing such milk to retail and wholesale customers for resale in the City of St. Louis, Missouri, and communities near St. Louis in Missouri. The milk thus sold is produced in the States of Illinois and

Missouri. The corporate defendants purchase milk from the producers in Illinois, consisting of over half the fluid milk sold by them. After purchase of the milk in Illinois it is transported by defendants to St. Louis, there it is intermingled in the corporate defendants' plants with milk produced in Missouri. (By local ordinance all milk sold in the City of St. Louis must be Pasteurized.) The indictment recites that fluid milk by its nature is perishable, cannot be stored, must reach consumers within a short time after production, and from day to day there is a continuous flow of fluid milk from the producers in Illinois and Missouri to consumers in St. Louis and vicinity. The corporate defendants sell and distribute 63 per cent of fluid milk consumed in the St. Louis area. Conspiracy of defendants, as alleged, is to fix uniform and non-competitive retail and wholesale prices for fluid milk sold by them in the St. Louis, Missouri, area during the past ten years, by virtue of a continuing agreement and concert of action among defendants that the corporate defendants would charge uniform prices for fluid milk sold by them. Things charged as the purpose of and to effect the conspiracy are the charging of uniform prices and various meetings at which it was agreed to and said defendants did fix a uniform price for fluid milk. The meetings commenced in July 1946 and ended in January 1948. The retail price of fluid milk in July 1946 was fixed at 17¢, wholesale 15¢. The last meeting, according to the indictment, fixed the retail price at 22½¢ and wholesale at 20½¢. The effect of the conspiracy, as intended by defendants, has been to increase and fix the price of milk to consumers sold by the corporate defendants in the St. Louis area and restrain interstate commerce in fluid milk.

## I.

The Government asserts that "while it is true that the Sherman Act applies only to unreasonable restraints of trade * * * price fixing agreements are per se unreasonable." Combinations to fix or regulate prices are banned by the Sherman Act. Such was the holding of the Supreme Court in Fashion Originators' Guild v.

Trade Commission, 312 U.S. 457, loc. cit. 466, 61 S.Ct. 703, 707, 85 L.Ed. 949:

"Petitioners, however, argue that the combination cannot be contrary to the policy of the Sherman and Clayton Acts [15 U.S.C.A. § 1 et seq.], since the Federal Trade Commission did not find that the combination fixed or regulated prices, parcelled out or limited production, or brought about a deterioration in quality. But action falling into these three categories does not exhaust the types of conduct banned by the Sherman and Clayton Acts."

More direct was the pronouncement of the Court in United States v. Socony-Vacuum Oil Co., 310 U.S. 150, loc. cit. 154, 155, 60 S.Ct. 811, 84 L.Ed. 1129.

"A combination formed for the purpose of controlling the market price of a commodity and possessing the power to make its control effective raises such danger of evil consequences which the Sherman Act was intended to prevent, that it falls within the direct condemnation of the statute and can not be removed by collateral considerations urged in justification of the restraint. United States v. Trenton Potteries Co., 273 U.S. 392, [47 S.Ct. 377, 71 L.Ed. 700, 50 A.L.R. 989].

"While the Act has been interpreted as forbidding only unreasonable restraints of trade and while this concept is of value in many situations where the nature of the restraint is such that the application of the statute is doubtful, the concept does not compel the conclusion that there are no restraints which ipso facto come within the condemnation of the Act."

The consequences of such combinations, at which the law is leveled, is stated in Ethyl Gasoline Corp. v. United States, 309 U.S. 436, loc. cit. 458, 60 S.Ct. 618, 626, 84 L.Ed. 852:

"Agreements for price maintenance of articles moving in interstate commerce are, without more, unreasonable restraints within the meaning of the Sherman Act because they eliminate competition, United States v. Trenton Potteries Co., 273 U.S. 392, 47 S.Ct. 377, 71 L.Ed. 700, 50 A.L.R. 989, *and agreements which create potential power for such price maintenance exhibited by*

*its actual exertion for that purpose are in themselves unlawful restraints within the meaning of the Sherman Act,* which is not only a prohibition against the infliction of a particular type of public injury but '*a limitation of rights * * * which may be pushed to evil consequences, and therefore restrained.*'" (Emphasis added.)

We pause to observe in the last ruling the words "potential power" for price maintenance. The agreement need not in fact accomplish that result. Note this language: "a limitation of rights * * * which may be pushed to evil consequences." On the same subject the Court said in Local 167 of International Brotherhood of Teamsters v. United States, 291 U.S. 293, loc. cit. 297, 54 S.Ct. 396, 398, 78 L.Ed. 804:

"The control of the handling, the sales and the prices at the place of origin before the interstate journey begins or in the State of destination where the interstate movement ends may operate directly to restrain and monopolize interstate commerce."

In line with the latest authorities, cited above, which it is claimed by some give the Sherman Act a more liberal interpretation than older cases, will be found Coronado Coal Co. v. U. M. Workers, 268 U.S. 295, loc. cit. 310, 45 S.Ct. 551, 556, 69 L.Ed. 963, where the Court said:

"The mere reduction in the supply of an article to be shipped in interstate commerce by the illegal or tortious prevention of its manufacture or production is ordinarily an indirect and remote obstruction to that commerce. But when the intent of those unlawfully preventing the manufacture or production is shown to be to restrain or control the supply entering and moving in interstate commerce, or the price of it in interstate markets, their action is a direct violation of the Anti-Trust Act."

The authorities on this proposition are reviewed in United States v. Food and Grocery Bureau of So. Cal., D.C. 43 F. Supp. 974, loc. cit. 977, 978, and there will be found a summary of the law in an opinion by Judge Yankwich:

"In assaying price-fixing agreements, the test is not so much whether the effect is felt after the movement of the goods has reached the end of the interstate journey. The inquiry seeks the effect upon prices in the market. And if this effect be shown, it matters not that the movement has come to a halt within the state. The teaching of the most recent cases, to which I have just referred, and which I also discussed in the opinion on the motions to dismiss and to strike, is too clear to absolve price-fixing agreements solely becauses their effect may not be felt until local sales are made, in retail trade, at the end of the journey. To interpret them in this manner is not to destroy whatever distinction may exist between interstate and local activities. It is merely to recognize that the Supreme Court, realizing the inter-relation between local and interstate commerce, has declined to recognize a break in the continuity of movement of articles originating in interstate commerce, and has asserted the controlling power of the anti-trust law over the entire process. And so, when the court said specifically that control of prices 'in the state of destination where the interstate movement ends' (Local 167 [of International Brotherhood of Teamsters] v. United States, 1934, 291 U.S. 293, 297, 54 S.Ct. 396, 398, 78 L.Ed. 804) may come under the interdict of the anti-trust laws, we cannot assume that it was not aware of the full implication of the words.

"The optative mood in the language of the court does not mean that in price-fixing other elements of restraint must be shown. If the language had that meaning, the teaching of the later case—that price-fixing alone is a violation—gives the contrary answer."

■ The indictment in this case states the defendants engaged in the conspiracy "to fix uniform and non-competitive retail and wholesale prices for fluid milk sold"; "[corporate] defendants * * * sell and distribute approximately 63 per cent of the fluid milk consumed in the St. Louis area"; "the * * * conspiracy has consisted of a continuing agreement and concert of action * * * the * * * terms of which have been that * * * corporate defendants would charge uniform and non-competitive retail and wholesale prices for fluid milk"; "the corporate defendants

have regularly \* \* \* charged uniform and non-competitive retail and wholesale prices in their sale of fluid milk"; "the conspiracy \* \* \* has had the effect, as intended by the defendants, of increasing, stabilizing, and otherwise controlling and fixing prices to consumers and other purchasers of fluid milk sold by the corporate defendants." We conclude the indictment states a violation of the Sherman Act, stressing those parts quoted together with the other allegations of the charge, provided it also pleads interstate commerce.

■■ The indictment having charged a conspiracy, the substance, purpose and effect of which is the stabilizing and fixing of prices, we are unable to agree with the defendants that the pleading must go further and state "factual allegations \* \* \* sufficient to show a direct and substantial impact upon interstate commerce such as to operate as a restraint thereupon." The control of prices "where the interstate movement ends may operate directly to restrain \* \* \* interstate commerce." Local 167 of International Brotherhood of Teamsters v. United States, supra. The agreement for price maintenance "without more" is an unreasonable restraint under the Sherman Act. See Ethyl Gasoline Corp. v. United States, supra. Other elements of restraint need not be charged or proven. Price fixing alone is a violation. See United States v. Food and Grocery Bureau, et al., supra.

## II.

■ On the question of interstate commerce raised by defendants' motions we direct attention to the charge that as to the milk originating in Illinois constituting over one-half of the milk sales of the corporate defendants, that while this milk is produced in Illinois the corporate defendants purchase the milk from the producers in Illinois and thereafter retain exclusive custody and control of the product until it reaches either the retail consumer or wholesaler in Missouri. Defendants, to free themselves from the interstate character stamped on the transaction by the parts of the charge noted, strenuously argue that the corporate defendants "warehouse" the milk in St. Louis, that it is

mingled with milk produced in Missouri, and that its form is changed by Pasteurization. How long milk must be held by the corporate defendants in their St. Louis plants to subject it to classification as being warehoused, we are not informed. The argument is not germane because we are passing on the allegations of the Government's pleading and it states, "there is a continuous flow of fluid milk from producers in the State of Illinois" and Missouri to defendants' customers, that "milk by its nature is perishable" and "must reach the consumer within a short time after production." By authority of discovered adjudications and having regard for the evident policy expressed in the Sherman Act, as declared in the ruling of our highest Courts, we are of the opinion the indictment charges a conspiracy in restraint of interstate commerce.

There are cases holding, when the commodities come to rest within the state, if their origin is in another state, that interstate commerce ends. Schechter Poultry Corp. v. United States, 295 U.S. 495, 55 S.Ct. 837, 79 L.Ed. 1570, 97 A.L.R. 947, is relied on by defendants in that respect. It involved, not a case under the Sherman Act, but validity of the N.R.A. legislation. This rule has had liberal application to sustain state laws concerning transportation and tax matters. But the same construction has not been given to cases arising under the Sherman Act. In Live Poultry Dealers' Protective Ass'n v. United States, 2 Cir., 4 F.2d 840, loc. cit. 842, Judge Hand, in passing on a case involving the same issue defendants here raise, held:

"However, the power of a state to tax goods (so it be without discrimination), which have been brought from other states, is by no means the measure of the powers of Congress over interstate commerce. The point is neatly illustrated in the cases, among others, which concern the regulation of prices for natural gas. Thus in Missouri v. Kansas Gas Co., 265 U.S. 298, 44 S.Ct. 544, 68 L.Ed. 1027, where the gas was delivered to wholesalers, the state might not act at all, while, when it is delivered direct to the consumers, it may, until Congress interfere. Pennsylvania Gas

Co. v. Public Service Commission, 252 U. S. 23, 40 S.Ct. 279, 64 L.Ed. 434. Perhaps, in the light of those cases, sales like those at bar are within the exclusive power of Congress in any event. But we need not go so far; by the Sherman Act [15 U.S. C.A. §§ 1—7, 15 note] (Comp.St. §§ 8820-8823, 8827–8830) Congress has exercised its fullest power over interstate commerce, and certainly such sales as these are within it."

The case just referred to was a proceeding under the Sherman Act. It involved a price-fixing agreement on live poultry after it arrived in New York. Speaking directly to the subject of interstate commerce the Court said:

"The defendants raise two chief objections: First, that the commerce is not interstate; and, second, that the agreement is not an unreasonable restraint of trade. As to the first, it should be noticed that the poultry reaches Washington Market after a pause at Hoboken only sufficient to put it into crates. It is, moreover, in proof that the sales take place on the same day as the poultry arrives in New York. We ignore such sales as take place in Hoboken, since they add no new feature to the case. So far as touches the point of interstate commerce, such a situation is precisely within Swift & Co. v. United States, 196 U.S. 375, 25 S.Ct. 276, 49 L.Ed. 518, and Stafford v. Wallace, 258 U.S. 495, 42 S.Ct. 397, 66 L. Ed. 735, 23 A.L.R. 229, both of which concerned the shipment of live stock."

A case more directly in point is United States v. Sheffield Farms Co., D.C., 43 F. Supp. 1, 4. The case was before the Court by attack on the Government's pleading by defendants. The defendants in the Sheffield Farms case, as here, "contend that the conspiracy alleged operated solely with respect to the prices charged for milk at wholesale in the City of New York after the milk had come to rest in city plants and after any milk which originated outside the state was intermingled with local milk, pasteurized and packaged. However, the milk could not have been sold in New York City if it had not been pasteurized because of a local ordinance, and the packaging is but a necessary incident to its distribution." The Court held:

"The temporary stoppage of commerce on its way to the ultimate consumer does not remove the flow from the jurisdiction of the Federal Government. United States v. General Motors, 7 Cir., 121 F.2d 376, certiorari denied October 13, 1941, [314 U. S. 618] 62 S.Ct. 105, 86 L.Ed. 497; Schechter Poultry Corp. v. United States, 295 U. S. 495, 544, 55 S.Ct. 837, 79 L.Ed. 1570, 97 A.L.R. 947; Local 167 v. United States, 291 U.S. 293, 54 S.Ct. 396, 78 L.Ed. 804; N.L.R.B. v. Jones & Laughlin Steel Corp., 301 U.S. 1, 57 S.Ct. 615, 81 L.Ed. 893, 108 A.L.R. 1352. Therefore the stoppage of the milk, coming across state lines, for the purpose of pasteurization and packaging or bottling, did not change its interstate character. Local 167 v. United States, supra."

In Lake Valley Farm Products v. Milk Wagon Drivers' Union, 7 Cir., 108 F.2d 436, 438, a like ruling was made. Similarity of facts to the present case is evident.

"The Farm Products Company purchases its daily requirements of fluid milk from the plaintiff Co-operative, which receives its products from farmers in Wisconsin, who deliver their milk to the plant of the Co-operative where it is loaded on motor trucks and transported over the public highways to the Farm Products Company in Chicago, which pasteurizes and bottles the milk, after which it is sold by the Farm Products Company to various persons referred to as 'vendors,' who severally own and operate their own automobile truck equipment. They in turn, after purchasing the milk and cream from the pasteurizing plant, distribute it to various stores which in turn sell it to the general public on a cash and carry plan."

Similarity in basis for claims of defendants is also apparent. The Court declared:

"Under the facts found, it is clear that there is an actual flow of milk in interstate commerce from the farm-receiving station in Wisconsin, through the plaintiff dairy into the retail cut-rate stores in Chicago."

The case involved a labor dispute and was reversed by the Supreme Court (311

U.S. 91, 61 S.Ct. 122, 85 L.Ed. 63) because the lower court was without jurisdiction under the Norris-LaGuardia Act, 29 U.S. C.A. § 101 et seq.

To argue that mere stoppage for bottling (and Pasteurization) and commingling in St. Louis destroyed the interstate character of the movement is to overlook the position occupied by the corporate defendants with regard to the product originating in Illinois. From the time of making purchase in Illinois, until it passed out of their hands, either by retail or wholesale disposal, the defendants controlled the product. Under the charge they purchased the milk with knowledge of the conspiracy and how the milk would be handled by them to effect the conspiracy. Thereafter the milk never left the possession and control of the corporate defendants, moving across the State line into and out of their St. Louis plant and into the consumer's hands in case of retail sale, at all times impressed with the object of the same conspiracy, by the same parties from origin in Illinois to final destination in Missouri. These facts, in our opinion, bring this case, as pled, more conclusively within the ban of the Sherman Act than some of the cases relied on by the Government. Take the case of United States v. Food and Grocery Bureau of So. Cal., D.C., 43 F.Supp. 966, loc.cit. 968, where the conspiracy was to fix prices of "products, such as milk, baking powder, cereals, sugar and the like, originating in interstate commerce." Ownership in this case must have changed hands more than once after the products came into the State of California. It is fair to conclude the products became a part of the conspiracy in some cases after they arrived in the State as the conspiracy was "started as an effort on the part of persons engaged in the food and grocery business." The conspiracy was to fix the retail price—after original boxes had been broken. The Court held the conspiracy was to restrain interstate commerce and was under the interdict of the Sherman Act. In affirming the lower court the Court of Appeals ruled, 9 Cir., 139 F.2d 973, loc. cit. 978:

"The Supreme Court in Local No. 167 v. United States, 291 U.S. 293, 297, 54 S.Ct. 396, 398, 78 L.Ed. 804, states that the control of prices 'in the state of destination where the interstate movement ends may operate directly to restrain and monopolize interstate commerce' ".

We find in Greater New York Live Poultry Chamber of Commerce v. United States, 2 Cir., 47 F.2d 156, loc. cit. 158, a comment on intent of shippers, as bearing on the question as to when shipments leave interstate commerce. There the Court said:

"It was clearly contemplated by the shippers that the poultry should pass through the receivers to the marketmen, for the shippers paid the charges for unloading, cooping and cartage to West Washington Market, and the price paid the shippers depended on market price made by resale to the marketmen. While the receivers cannot on this record be held to be mere agents of the shippers, as in Live Poultry Dealers' Protective Ass'n v. United States, 2 Cir., 4 F.2d 480, their intervention as purchasers does not necessarily cause interstate shipment of the poultry to end on delivery to them."

And in the present case, when the corporate defendants purchased the milk in Illinois, under the facts pled in the indictment, they contemplated and intended every step the milk would take until delivery, with ultimate intent it should be governed in its sale in Missouri by the terms of the conspiracy. Under these circumstances we find no basis for terminating the interstate character of the shipment, at any point on the journey from producer to consumer, under a charge it was a "continuous journey," together with the other allegations of the indictment.

Under this rationale we think the ruling in Binderup v. Pathe Exchange, 263 U.S. 291, loc. cit. 309, 44 S.Ct. 96, 99, 68 L.Ed. 308, sustains our position. We quote:

"The film contracts were between residents of different states, and contemplated the leasing by one to the other of a commodity manufactured in one state and transported and to be transported to and used in another. The business of the distributors of which the arrangement with the exhibitor here was an instance, was clearly interstate. It consisted of manufac-

turing the commodity, in one state, finding customers for it in other states, making contracts of lease with them, and transporting the commodity leased from the state of manufacture into the states of the lessees. If the commodity were consigned directly to the lessees, the interstate character of the commerce throughout would not be disputed. Does the circumstance that in the course of the process the commodity is consigned to a local agency of the distributors, to be by that agency held until delivery to the lessee in the same state, put an end to the interstate character of the transaction and transform it into one purely intrastate? We think not. The intermediate delivery to the agency did not end *and was not intended to end* the movement of the commodity. *It was merely halted as a convenient step in the process of getting it to its final destination. The general rule is that where transportation has acquired an interstate character 'it continues at least until the load reaches the point where the parties originally intended that the movement should finally end.'* " (Emphasis added.)

If we are correct in our conclusion that the fluid milk at the time it was purchased in Illinois by the corporate defendants was impressed with the unlawful agreement and conspiracy, and thereafter travelled under such defendants' control and ownership to retail consumer and wholesaler in Missouri in furtherance of the conspiracy, then the Frankfort Distilleries case, United States v. Frankfort Distilleries, Inc., 10 Cir., 1944, 324 U.S. 293, 65 S.Ct. 661, 663, 89 L.Ed. 564; is applicable. This was a case under the Sherman Act, which reached the Supreme Court on a question of sufficiency of the Government's pleadings. The charge of price-fixing as the object of the conspiracy was disposed of in the following language:

"The effect, and if it were material, the purpose of the combination charged, was to fix prices at an artificial level. Such combinations, affecting commerce among the states, tend to eliminate competition, and violate the Sherman Act per se."

A concurring opinion by Mr. Justice Frankfurter not only indicates the trend in construction given to the Sherman Act by that Court, to which we have referred, but announced a conclusion on an issue like that now before this Court which we believe is applicable:

"The decision of the court below is not without support in what has been said in the past in holding that, apart from the Twenty-first Amendment, this was a restraint local in its nature and therefore outside the scope of the Sherman Law. But price-fixing is such an immediate restraint upon trade that I do not think that the reach of the consequences of such an obvious restraint should be determined by drawing two nice lines as a matter of pleading. The case is before us, in effect, on demurrer to the indictment and judged abstractly, as a matter of pleading, I cannot say that the indictment was demurrable."

We are not unaware of the apparent conflict in our conclusion with that of the District Court for the Southern District of Ohio in United States v. French Bauer, D.C., 48 F.Supp. 260. We have the greatest respect for opinions of District Courts but nevertheless we are not bound to follow them if we are not in agreement. From the meager facts recited in the opinion we are unable to determine the full basis of the ruling on one point in particular which we consider important in the present case. That is, control of the product from purchase in one State until delivery in another. The French Bauer opinion apparently disagrees with the rule, as we understand it, that price-fixing is per se a violation of the Sherman Act.

As to the Schechter case, relied on by defendants, we do not think it controlling in support of their position, and the Appellate Court (Food and Grocery Bureau of So. Cal. v. United States, supra) and the Supreme Court (United States v. Wrightwood Dairy Co., supra) have apparently held likewise. It was not a case under the Sherman Act. It involved hours and wages of employees—not price paid for merchandise. That this distinction is vital to defendants' position is indicated by the ruling of the same Court in United States v. Wrightwood Dairy Co., 315 U.S. 110, loc.

860

cit. 123, 62 S.Ct. 523, 528, 86 L.Ed. 726, where the Court said:

"In the Schechter case the Court was concerned only with the alleged infringements of the 'Code of Fair Competition' for the live poultry industry of the New York City metropolitan area, which had been adopted under the provisions of § 3 of the National Industrial Recovery Act of June 16, 1933, 48 Stat. 195, 196. The violations of the code charged were that wholesale distributors who had purchased poultry in New York, most of which came from without the state, and who were engaged in slaughtering and reselling to retailers, had failed to maintain for their employees wages and hours prescribed by the code, and had failed to abandon 'selective selling' to their customers in New York which the code had prohibited.

"The Court's opinion pointed out that the defendants *were not charged with injury to interstate commerce or interference with persons engaged in that commerce,* and that the acts charged had no different relation to or effect upon interstate commerce than like acts in any other local business which handles commodities brought into the state. Schechter Corp. v. United States, supra, 295 U.S. pages 545, 546, 55 S.Ct. pages 849, 850, 79 L.Ed. 1570, 97 A.L.R. 947. It characterized their effect upon interstate commerce as 'indirect', and distinguished them from those acts and transactions intrastate which, because they 'directly affect' interstate commerce, are within the Congressional regulatory power. In explanation of this distinction and as examples of direct effects which are within the commerce power it referred to the 'fixing of rates for intrastate transportation which unjustly discriminate against interstate commerce', citing the Shreveport Case, supra, and referred to intrastate restraints upon competition injuriously affecting interstate commerce condemned by the Sherman Act, citing Local 167 v. United States, supra, and other cases." (Emphasis added.)

We think the very language of the Schechter opinion demonstrates how that case differs from this case. The Court said in the Schechter opinion, 295 U.S. at page 542, 543, 55 S.Ct. 848, 849, 79 L.Ed. 1570, 97 A.L.R. 947:

"But the code provisions, as here applied, do not concern the transportation of the poultry from other states to New York, or the transactions of the commission men or others to whom it is consigned, or the sales made by such consignees to defendants. * * *

"The undisputed facts thus afford no warrant for the argument that the poultry handled by defendants at their slaughterhouse markets was in a *'current'* or *'flow'* of interstate commerce, and was thus subject to congressional regulation."

As we have stated, in this case under the pleading of the Government, after defendants formed the conspiracy they journeyed regularly into Illinois and purchased milk to use in effecting the conspiracy. The indictment states there was a "continuous" flow of milk from producers in Illinois to consumers in Missouri. It may well be said the conspirators used the ultimate means of sales in Missouri, which in and of themselves were intrastate activities, to attain the end of fixing prices on milk they had obtained in Illinois. Cases falling under this head were excepted from the ruling in the Schechter case, 295 U.S. loc. cit. 544, 55 S.Ct. loc. cit. 849, 79 L.Ed. 1570, 97 A.L.R. 947:

"And combinations and conspiracies to restrain interstate commerce, or to monopolize any part of it, are none the less within the reach of the Anti-Trust Act (15 U.S.C.A. § 1 et seq.) because the conspirators seek to attain their end by means of intrastate activities."

Finally we direct attention to the case of Mandeville Island Farms, Inc., et al. v. American Crystal Sugar Company, 68 S. Ct. 996, 1001. This is a case under the Sherman Act. The issue on the pleading was stated thus:

"Broadly petitioners regard the entire sequence of growing the beets, refining them into sugar and distributing it, under the arrangements set forth, as a chain of events so integrated and taking place in interstate commerce or in such close and intimate connection with it that, for purposes of applying the Sherman Act, the

complete sequence is an entirety and no part of it can be segregated from the remainder so as to put it beyond the statute's grasp.

"Respondent, on the contrary, broadly severs the phase or phases of growing and selling beets from the later ones of refining them and of marketing the sugar. The initial growing process together with sale of the beets, and it would seem also the intermediate stage of refining, are taken to be "purely local," since all occurred entirely within California; therefore were wholly intrastate events; and consequently were beyond the Sherman Act's reach."

While the pleading went further than the indictment in the present case and charged other effects on interstate commerce than price fixing alone, we cite the case principally as bearing on defendants' claim that the bottling, commingling and Pasteurization changed the form of the product and arrested interstate commerce. If manufacture, in and of itself, of beets into sugar cannot stop the interstate flow of goods, from which sugar is processed, then it would seem to follow that bottling, Pasteurization and commingling of milk would not. The holding of the Court on this point is:

"The broad form of respondent's argument cannot be accepted. It is a reversion to conceptions formerly held but no longer effective to restrict either Congress' power, Wickard v. Filburn, 317 U.S. 111, 63 S.Ct. 82, 87 L.Ed. 122, or the scope of the Sherman Act's coverage. The artificial and mechanical separation of 'production' and 'manufacturing' from 'commerce,' without regard to their economic continuity, the effects of the former two upon the latter, and the varying methods by which the several processes are organized, related and carried on in different industries or indeed within a single industry, no longer suffices to put either production or manufacturing and refining processes beyond reach of Congress' authority or of the statute."

### Order

Motions of defendants, and each of them, to dismiss the indictment are overruled.