**UNITED STATES v. DETROIT SHEET METAL & ROOFING CONTRACTORS ASS'N, Inc. et al.**

Crim. A. No. 33452.

United States District Court
E. D. Michigan.

Oct. 13, 1953.

John W. Neville, Chief, Detroit Office, Antitrust Division, U. S. Dept. of Justice, John J. Mulvey, Paul A. Owens, James A. Broderick, Trial Attys., Detroit, Mich., for plaintiff.

Clark, Klein, Brucker & Waples, by Wilber M. Brucker, Detroit, Mich., for Detroit Sheet Metal & Roofing Contractors Ass'n, Inc., Robert Hutton Co., Thomas Marshall, The Chas. Sexauer Roofing Co., Frank Dempsey, E. G. Bush and Joseph A. Wittstock, d/b/a Wittstock Bros.

Smith and Huffaker, by Melvin S. Huffaker, Detroit, Mich., for John D. Busch & Sons, Inc., William G. Busch and William W. Busch.

Edward P. Frohlich, Detroit, Mich., for J. D. Candler Roofing Co., Clarence L. Candler and Gerald W. Morrison.

Fitzgerald, Walker, Conley & Hopping, by Fred R. Walker, Detroit, Mich., for Wallace Candler, Inc., O. D. Wood, T. F. Beck, d/b/a T. F. Beck Co., and Albert Bershback, d/b/a American Roofing Co.

Taft, Stettinius & Hollister, by Robert Taft, Jr., Cincinnati, Ohio, Dickinson, Wright, Davis, McKean & Cudlip, by

Robert E. McKean, Detroit, Mich., for Philip Carey Mfg. Co.

Beaumont, Smith & Harris, by Charles Wright, Jr., Detroit, Mich., for The R. C. Mahon Co., R. C. Mahon and Walter Scott.

Friedman, Myers & Keys, by Joseph H. Jackier, Detroit, Mich., for Schreiber Roofing Co. and Harold Schreiber.

Abbott, Roberts, Smith & Libby, by David E. Roberts, Detroit, Mich., for Sullivan-Bernhagen Co., Inc., and William P. Sullivan, Sr.

Gould & Colman, by Arthur I. Gould, Detroit, Mich., for Bernard Beck, d/b/a Milbrand Roofing & Metal Ceiling Co.

Matheson, Dixon & Brady, by George S. Dixon, Detroit, Mich., for Don M. Chaffee, d/b/a Chaffee Roofing Co.

Julian G. McIntosh, Detroit, Mich., for Arthur Hesse, d/b/a Detroit Cornice & Slate Co.

LEVIN, District Judge.

There are numerous motions before the Court, made on behalf of the various defendants, to dismiss an indictment against them charging violation of Section 1 of the Sherman Act, 15 U.S.C.A. § 1. This legislation, with certain exceptions with which we are not here concerned, makes illegal every contract, combination, or conspiracy in restraint of trade among the several states or with foreign lands. In addition, there is a motion by certain of the defendants to strike alleged surplusage from parts of the indictment.

## I. The Indictment

The defendants named are the Detroit Sheet Metal and Roofing Contractors Association, Inc., hereinafter referred to as the Association, which is described as a trade association of roofing and sheet metal contractors; nine corporations which are described as roofing contractors; twelve individual defendants who are described as having been associated with or employed by one of the preceding nine corporations and to have been actively engaged in the management, direction, and control of the affairs, policies and acts of the corporations; and six individuals who are described as building contractors, all said to be doing business in the City of Detroit and vicinity. The corporate and individual contractors are said to have been members of the Association during all or part of the period covered by the indictment.

Paragraphs 8–14 describe the nature of defendants' business which involves the installation and repair of built-up roofs. What is meant by a built-up roof is not explained in the indictment, but it is implicit that the phrase refers to a roof which is built on the site of the project as distinguished from a pre-fabricated roof. The indictment states that the roofs are built pursuant to contracts entered into with a general contractor or builder responsible for the construction of the project, usually on the basis of competitive bidding. The contract price is said to include the cost of materials and the cost of their installation as a built-up roof. It is further stated that the materials which consist of sheathing paper, felt, asbestos, pitchblend, gravel, slag, pitch, tar and asphalt are largely produced by manufacturers located outside the State of Michigan and are purchased by the roofing contractor either directly from the out-of-state manufacturers or are purchased from jobbers and wholesalers within the state who in turn have acquired the materials from the out-of-state manufacturers. The last sentence of paragraph 12 reads as follows: "Said materials, whether purchased direct or through distributors, jobbers, or wholesalers, are all shipped in interstate commerce and move in a continuous and uninterrupted flow of interstate commerce from the out-of-state manufacturers to the ultimate owner or builder at the site of installation."

Paragraph 11 avers that the out-of-state manufacturers, in addition to selling to roofing contractors generally, approve selected contractors in certain areas to install so-called "bonded roofs." Such contractors are called "bonded roofers" and such "bonded roofs" are

installed according to the manufacturer's specifications, are subject to the manufacturer's inspection, and carry with them the manufacturer's guarantee for a stated period of years, both as to workmanship and the quality of the materials used. "Bonded roofs" are said to be essential to any important construction job and the status of a "bonded roofer" is "a valuable, if not a necessary, asset to anyone hoping to compete successfully in the built-up roofing contracting business."

In Paragraph 14 defendants, who according to the indictment represent fifteen of a total of fifty such contractors in the area, are said to have done approximately seventy per cent of the ten million dollars of built-up roofing done in the City of Detroit and vicinity in 1951. It is further stated that for the same period, out of this total of ten million dollars, seven and a half million dollars were spent for "bonded roofs," defendants doing approximately ninety per cent of this "bonded roof" business.

Paragraphs 15–17 set forth in detail the alleged characteristics of and the alleged means by which were accomplished the combination and conspiracy in restraint of trade and commerce. It is said that there has been a continuing agreement and concert of action among the defendants and others unknown to the Grand Jury, whereby they have used the Association to determine and adhere to "uniform rules, methods and policies in computing bids and otherwise doing business"; that the Association has been employed as a center where its members and others could compare and exchange information on a given job in advance of the submission of bids; that it was operated as the medium through which a given contractor would be designated to submit the winning bid on the construction project, and that it was then understood and agreed by the other contractors participating in the arrangement that they would not submit bids which would compete with the bid of the chosen contractor, but instead would submit fictitious bids to give the semblance of competition but which were so high as not to offer a threat to the chances of the appointed contractor.

Further, the defendants are charged with attempting to enlist other contractors who were not members of the Association into the Association and to urge and coerce nonmember contractors to adopt the same policies and to employ the same practices as to bids as were adopted by the members of the Association. The defendants are said to have induced or to have attempted to induce out-of-state manufacturers to withhold or deny their "bonded roof" guarantee or the status of "bonded roofer" to those contractors who refused to cooperate with the Association program.

Paragraph 18 declares that the purpose, intent and necessary effect of these activities has been "to establish, fix, and maintain high, arbitrary and noncompetitive prices in the sale of materials for and the installation of built-up roofing"; to suppress and eliminate competition among the defendants and to suppress and eliminate the competition of roofing contractors who are nonmembers of the Association; and to deny to the consumer "the benefits of free competition in the sale of materials for and the installation of built-up roofing."

Paragraph 15 (which in the indictment, as returned, is positioned approximately midway between the averments which have been above presented) charges that this alleged combination and conspiracy on the part of the defendants and the acts performed in pursuance thereof constitute an "unreasonable restraint of the aforesaid trade and commerce in the sale of materials for and the installation of built-up roofing * * *." It appears to the Court, and it has so been maintained by the Government in its briefs and oral arguments, that the "aforesaid trade and commerce" alludes to the averment of Paragraph 12 that the roofing materials used in the construction of built-up roofs are "all shipped in interstate commerce and move in a continuous and uninterrupted flow of interstate commerce from the out-of-

state manufacturers to the ultimate owner or builder at the site of installation."

## II. Sufficiency of the Indictment

Defendants have advanced many objections to the sufficiency of the indictment. Underlying each of these is the same theme—the absence of proper and adequate averments to show that the practices complained of in the indictment constitute a restraint in interstate commerce or that they so affect interstate commerce as to produce a restraint thereupon.

■ I hold the indictment to be sufficient. Although its draftsmanship may be subject to valid criticism, I am concerned only with whether it in substance performs the functions which the law requires of it. The indictment does state an offense; it does put the defendants on notice of the charges; and the results of the trial would bar a second prosecution for the same offense. See Hagner v. United States, 285 U.S. 427, 431, 52 S.Ct. 417, 76 L.Ed. 861; United States v. Armour & Co., 10 Cir., 137 F. 2d 269, 270.

■ A combination formed for the purpose of fixing the price of a commodity in interstate commerce is a *per se* violation of Section 1 of the Sherman Act. United States v. Socony-Vacuum Oil Co., Inc., et al., 310 U.S. 150, 60 S.Ct. 811, 84 L.Ed. 1129. The fixing of the price at which the commodity is sold locally, at the end of the interstate journey, is equally as offensive as the fixing of the price at which sales across state lines are made. Universal Milk Bottle Service, Inc., v. United States, 6 Cir., 1951, 188 F.2d 959; United States v. Chrysler Corporation Parts Wholesalers, Northwest Region, 9 Cir., 1950, 180 F.2d 557.

■ In the instant indictment the defendants are charged with a combination and conspiracy, the purpose and effect of which is to establish, fix and maintain high prices in the sale of materials for and the installation of built-up roofing (Paragraph 18). These materials are described as moving in a continuous flow of interstate commerce from the out-of-state manufacturers to the ultimate owner or builder at the site of their installation (Paragraph 12). Reading these two paragraphs together, the indictment charges that roofing materials remain in interstate commerce until they reach the ultimate consumer at the site of their installation into built-up roofs and that the defendants have combined to fix the prices at which the materials are sold to such ultimate consumer.

■ In Universal Milk Bottle Service, Inc., v. United States, supra, the Court of Appeals for the Sixth Circuit, in affirming the lower court, United States v. Universal Milk Bottle Service, Inc., D.C. Ohio 1949, 85 F.Supp. 622, at page 629, adopts the following reasoning of Chief District Judge Nevin:

"The Court, however, agrees with the claim of the Government that today's practical concept of interstate commerce dictates that commodities in interstate commerce remain in that status until they reach the point where the parties originally intended that the movement should finally end. If, as contended by the Government, the distribution and sale of milk at wholesale and retail by the defendants is in interstate commerce, or is an integral part of the interstate flow from the farms of Kentucky and Indiana producers to consumers in Ohio, the point where the parties originally intended that the movement should end, then there can be no doubt but that the conspiracy of the defendants to fix prices at which such sales shall be made constitutes a violation of the Sherman Act."

Additional factual allegations, illustrating in detail the effects of such a combination upon interstate commerce, are not required. As a matter of law, those effects are held automatically to ensue from price-fixing practices. United States v. Northeast Texas Chapter, National Electrical Contractors Ass'n, 5 Cir., 1950, 181 F.2d 30; United States

v. St. Louis Dairy Company, D.C.Mo. 1948, 77 F.Supp. 853.

 However, argue the defendants, whatever might be the law with respect to the fixing of prices for the sale of roofing materials, the defendants have not engaged in such an activity. They deny that they sell roofing materials, and they declare that they are engaged solely in the repair and construction of built-up roofs. Defendants argue that a conspiracy to fix the contract prices for the construction of built-up roofing is not the same as a conspiracy to fix prices at which roofing materials are sold, and that the preceding reasoning does not apply to them.

Whether defendants have or have not sold roofing materials so as to become subject to the strictures of the price-fixing doctrine is a matter for proof at the time of the trial. But at the present stage of the proceedings I am not at liberty to disregard the plain and unequivocal averment of Paragraph 18 (also Paragraph 15) of the indictment that the defendants have engaged in a combination and conspiracy, the purpose and effect of which has been to fix prices "in the sale of materials for and the installation of built-up roofing." This has sufficiently alleged a price-fixing offense so as to entitle the Government to its day in court.

General Shale Products Corp. v. Struck Const. Co., 6 Cir., 1942, 132 F.2d 425, strongly urged by the defendants in support of their position, is not, in my opinion, helpful to them. In that case defendants were charged with a violation of the Robinson-Patman Act, 15 U.S.C.A. § 13, which condemns discrimination between different purchasers in the sale price of a specific commodity. After a pretrial hearing, the trial court dismissed the action and the Court of Appeals affirmed the dismissal on the grounds that the plaintiff had not made out any discrimination in the sale of brick of like quality and quantity to different purchasers. The Court declared that defendants had not sold brick but had contracted to erect brick structures. Since other elements than the cost of brick would enter into such contracts, it would clearly be impossible to show a discrimination in the sale of the specific commodity, as technically required, even if a discrimination in the over-all contract price were proved.

The issue now before me, however, is an entirely different one. We are here concerned exclusively with the indictment and not with what may be discovered by subsequent proceedings. Insofar as the present indictment does allege price-fixing in both the sales of the specific commodities as well as in their installation, the instant case, at least in its present posture, possesses that very element which the Court found lacking in Struck.

 Furthermore, the absence of an offense under the Robinson-Patman Act in Struck has no applicability for purposes of Section 1 of the Sherman Act. The Robinson-Patman Act is intended to make illegal a specialized and well-defined type of competitive activity, an essential element of which is the sale of a specific commodity. The Sherman Act, on the other hand, is general in its application and an offense thereunder can as readily be produced by one type of restraint as by another. The technical requirement as to form, which is characteristic of a Robinson-Patman violation, is not present here as long as we find that the activity has a potential for restraining interstate commerce. Therefore, for purposes of Section 1 of the Sherman Act, a combination to fix the contract price at which roofing materials are installed may, on a proper showing, be held to have the same adverse effect as the fixing of the sale price of such materials. It is my opinion that the averments of the indictment lay the proper foundation to entitle the Government to proceed with such a showing. I sustain it not only on the basis of the averments made with respect to the fixing of the sale prices of roofing materials but also with respect to the fixing of the prices for the installation of such ma-

terials. If I am to credit defendants' argument that they do not sell roofing materials but merely contract to build or repair roofs, I must infer that such contracts comprise the sole means by which roofing materials are disposed of by the defendants to the ultimate consumer. A restraint of the proportions here alleged, which is applied at that point where the roofing materials pass through defendants' hands en route to their ultimate destination in their interstate journey, would constitute a restraint upon interstate commerce.

■ The fixing and maintenance of high prices for roofing construction and repair points to a reduction in the volume of such activity with a resultant reduction in the consumption of roofing materials, and a retardation of the flow of such materials from the out-of-state manufacturers through the interstate channels of distribution. These effects of price-fixing have acquired such recognized status in the antitrust law that when such a charge is made, I am compelled to take cognizance of such effects in reading the indictment. If an allegation of price-fixing is sufficient, without the necessity of detailed factual averments as to the effects of such a practice upon interstate commerce, when it is made with respect to the sales of roofing materials in interstate commerce, such an allegation carries with it the same economic implications, at least for the purpose of charging an offense, when it is made with respect to the only other process by which defendants move such materials in interstate commerce to the ultimate consumer. If it were otherwise, when reading the portion of the indictment relating to the fixing of prices in the installation of roofing materials, I would be compelled to dismiss from my mind those identical inferences which I am, as a matter of law, obliged to draw when the indictment speaks of price-fixing in the sales of roofing materials.

The charge against the defendants is that they have throttled the flow of roofing materials in interstate commerce by an illegal restraint at the final outlet through which the materials reach the ultimate consumer. It matters not whether defendants fix the price of the roofing materials or whether they fix the contract price which includes both the cost of the roofing materials and the cost of their installation. In either event, I must infer that the practice has the same potential for affecting the consumption of roofing materials and that such an effect will inevitably be reflected in the interstate channels of distribution. Paragraph 15 of the indictment expressly charges that the alleged combination has produced such a result.

■ The adverse effect on interstate commerce is not excused because roofing construction is a "local activity." It is now abundantly clear that rigid distinctions which once were made to separate manufacturing and other local activities from commerce are no longer valid. Such distinctions have been replaced by more flexible criteria as greater awareness of the sensitive inter-relationship of economic activity has developed. As the Supreme Court of the United States said in United States v. Women's Sportswear Manufacturers Association, 336 U. S. 460, 464, 69 S.Ct. 714, 716, 93 L.Ed. 805:

"If it is interstate commerce that feels the pinch, it does not matter how local the operation which applies the squeeze."

And in Mandeville Island Farms, Inc., v. American Crystal Sugar Co., 334 U. S. 219, 232, 68 S.Ct. 996, 1004, 92 L.Ed. 1328:

"With extension of the Shreveport [Houston, East & West R. Co. v. U. S., 234 U.S. 342, 34 S.Ct. 833, 58 L.Ed. 1341] influence to general application, it was necessary no longer to search for some sharp point or line where interstate commerce ends and intrastate commerce begins, in order to decide whether Congress' commands were effective. For the essence of the affectation doctrine was that the exact location of this line made no difference, if the forbidden effects flowed across it to the

injury of interstate commerce or to the hindrance or defeat of congressional policy regarding it."

And in an earlier case, Local 167, International Brotherhood of Teamsters, etc., v. United States, 291 U.S. 293, 297, 54 S.Ct. 396, 398, 78 L.Ed. 804:

"But we need not decide when interstate commerce ends and that which is intrastate begins. The control of the handling, the sales and the prices at the place of origin before the interstate journey begins or in the state of destination where the interstate movement ends may operate directly to restrain and monopolize interstate commerce. * * * The Sherman Act denounces every conspiracy in restraint of trade including those that are to be carried on by acts constituting intrastate transactions."

In Mandeville Island Farms, Inc., v. American Crystal Sugar Co., supra, it was concluded that the effects of a conspiracy to fix the local prices at which defendants were able to purchase sugar beets in the State of California would be projected throughout the entire process of refining and distributing so as eventually to be felt in the interstate sale of the finished sugar product. In Local 167, International Brotherhood of Teamsters, etc., v. United States, supra, a conspiracy to restrain the local sale and distribution of poultry at the terminal point of the interstate journey, after the shipment had already arrived in the state of consumption, was similarly said to burden interstate commerce.

In charging a restraint upon an integral part of the total process by which roofing materials move in interstate commerce from out-of-state manufacturers to local consumers, the two preceding cases teach that this indictment has set forth a situation which falls within the scope of the congressional authority and policy to regulate restraints upon interstate commerce. Furthermore, there can be little question that price-fixing, allocation of customers, and restriction of competition which

have been charged against defendants here, are precisely the types of abuse which congress sought to eliminate through the Sherman Act. As Mr. Justice Stone, later Chief Justice, said of this legislation in Apex Hosiery Co. v. Leader, 310 U.S. 469, 493, 60 S.Ct. 982, 992, 84 L.Ed. 1311:

"The end sought was the prevention of restraints to free competition in business and commercial transactions which tended to restrict production, raise prices or otherwise control the market to the detriment of purchasers or consumers of goods and services, all of which had come to be regarded as a special form of public injury."

And at page 485 of 310 U.S., at page 987 of 60 S.Ct.:

"And in the application of the Sherman Act, as we have recently had occasion to point out, it is the nature of the restraint and its effect on interstate commerce and not the amount of the commerce which are the tests of violation. See United States v. Socony-Vacuum Oil Co., 310 U.S. 150, [224] note 59, 60 S. Ct. 811, [844] 84 L.Ed. 1129. Cf. National Labor Relations Board v. Fainblatt, 306 U.S. 601, 606, 59 S.Ct. 668, 671, 83 L.Ed. 1014."

In view of this clear congressional intent and constitutional authority and in the light of the present tendency to eschew mechanical formularies in determining whether the impact of a questioned practice is local or interstate, the acts with which the defendants are charged must be held to constitute a violation of Section 1 of the Sherman Act. Knowing, as we now do, how immediately responsive to local consumption demands are the commercial operations of the out-of-state manufacturer and knowing how the health of the building industry generally is a matter of overriding concern for the economic welfare of the nation, the conclusion is inescapable that this indictment has described a pattern of activity which offends national policy as defined by Con-

gress in the Sherman Act. Compare United States v. Northeast Texas Chapter, supra, and United States. v. Minneapolis Electrical Contractors Ass'n, D.C.Minn.1951, 99 F.Supp. 75, both of which opinions deal with restraints in the sale and installation of electrical equipment.

Levering & Garrigues Co. v. Morrin, 289 U.S. 103, 53 S.Ct. 549, 77 L.Ed. 1062, and Industrial Association of San Francisco v. United States, 268 U.S. 64, 45 S.Ct. 403, 69 L.Ed. 849, are not opposed to this conclusion. Those cases involved combinations of businessmen and workers in labor disputes. See United States v. Frankfort Distilleries, Inc., 324 U.S. 293, 297, 65 S.Ct. 661, 89 L.Ed. 951. The Sherman Act was not designed to prevent collective action in genuine labor controversies even where such activity produced an adverse effect upon interstate commerce. Apex Hosiery Co. v. Leader et al., 310 U.S. 469, 495, 497, 60 S.Ct. 982, 84 L.Ed. 1311.

 Moreover there is an additional allegation in the instant case which if true means that the conspiracy has not been limited to the vicinity of Detroit but has reached across state lines. The Government charges that the defendants induced or attempted to induce out-of-state manufacturers to withhold their "bonded roofer" approval from non-cooperating roofers. The use of a boycott or the threat of a boycott to restrain those engaged in interstate commerce from choosing freely with whom and on what conditions they will deal with local competitors of Association members would be a violation of Section 1 of the Sherman Act. Cf. United States v. Women's Sportswear Manufacturers Association, 336 U.S. 460, 464–465, 69 S.Ct. 714, 93 L.Ed. 805; United States v. Frankfort Distilleries, Inc., 324 U.S. 293, 298, 65 S.Ct. 661, 89 L.Ed. 951. Where a combination, as alleged, backed up by the power which control of seventy per cent of the local market gives it, requests the out-of-state manufacturer to discriminate against certain non-cooperating roofers, regardless of how softly the request is made, there is a veiled threat to deprive the manufacturer, who refuses to comply, of its share of this local market. This is an allegation of sufficient force, particularly when read in the context of the entire indictment, to entitle the Government to offer proof of the use of illegal pressure by the Association to restrain the out-of-state manufacturers, if such should turn out to be the case.

## III. Surplusage

 The motion made by three of the defendants to strike as surplusage certain allegations of the indictment which relate to the installation of built-up roofs and to the practices and activities of the Association is denied. The contentions of these defendants that the installation of built-up roofs is an intrastate activity which does not involve a violation of the Sherman Act has been disposed of in the preceding discussion. These defendants also maintain that the allegations with respect to the practices of the Association are surplusage since they aver activities which are lawful and innocent. I cannot agree with this assertion. The import of these allegations is to make out a plan of price-fixing, allocation of customers and boycotting of competitors. Despite the fact that some practices engaged in by the Association may not in themselves have been violations of Section 1 of the Sherman Act, the pattern which may be established by proof of these alleged facts would reveal such a violation.

## IV. Immunity

The motions made by individual defendants that the indictment should be dismissed as to them because they are entitled to immunity pursuant to the Acts of Feb. 25, 1903 and June 30, 1906, 15 U.S.C.A. §§ 32, 33, is likewise denied.

 In response to subpoenas duces tecum which were addressed to the corporate defendants, said individual defendants who were acting as officers and agents of the corporate defendants surrendered certain documents and papers of the corporation to Government coun-

sel. It does not appear that said individual defendants testified or appeared before the Grand Jury. A corporation does not enjoy the privilege against self-incrimination nor do the statutory provisions, above referred to, confer immunity upon a corporation for evidence furnished in obedience to such subpoenas. In United States v. White, 322 U.S. 694, 64 S.Ct. 1248, 88 L.Ed. 1542, it is held that the official representative of a collective group cannot claim the privilege against self-incrimination and refuse to produce the group's papers and records in response to a demand upon such group even if the documents are personally incriminating. Since the immunity provisions are designed to compel the disclosure of material which would otherwise be suppressed as a result of the invocation of the privilege against self-incrimination, a party is entitled to immunity only in those situations where he might have claimed the privilege. See Heike v. United States, 227 U.S. 131, 142, 33 S.Ct. 226, 57 L.Ed. 450. In view of the fact that defendants could not have claimed the privilege under these circumstances, it follows that they are unable to invoke the immunity clauses. Cf. Lumber Products Ass'n, Inc., v. United States, 9 Cir., 1944, 144 F.2d 546, 553.

### V. Statute of Limitations

The motion to dismiss the indictment on the grounds that the offenses charged do not fall within the statute of limitations is denied. Paragraphs 5, 15 and 19 of the indictment adequately allege that the acts and practices complained of were all performed continuously up until the date of the return of the indictment and within the period of three years prior to that date, which is the statutory period provided in 18 U.S.C.A. § 3282.

The Philip Carey Mfg. Co., one of the defendants, makes an additional argument with respect to the statute of limitations. It contends that it withdrew from the Association more than three years prior to the return of the indictment and, consequently, could not be guilty of any of the practices complained of against the Association. This argument misconstrues the charge of the indictment which is directed against the named defendants because of their participation in a conspiracy to organize and use the Association for illegal purposes and to commit other illegal acts. Paragraph 16 of the indictment avers that the defendants did certain forbidden acts, not that those acts were done by the Association. Although the Association may have been an important tool of the alleged conspiracy, a defendant could participate in the conspiracy as alleged without being a member of the Association. In any event, the issue of whether said defendant was or was not a member of the Association is a question of fact which must be postponed until the trial.

### VI. Authority for Corporate Acts

The remaining motion to dismiss the indictment is made on behalf of The Philip Carey Mfg. Co., and is likewise denied. This defendant objects that Paragraph 6 of the indictment, which avers that the acts said to be done by a defendant corporation were "authorized, ordered, or done by the officers, agents or directors of said defendant * * *", fails to allege that such corporate acts were duly authorized.

This allegation of the indictment, although harmless, is superfluous since a corporation can act only through its officers or agents. Where the indictment charges the corporation with an offense, it need not indicate the parties for whose acts the corporation is being charged. Where such names are needed by defendants to enable them to prepare for trial they can be obtained through the appropriate discovery procedure. It follows that if the indictment need not list the names of the parties through whom the corporation acted, *a fortiori* it need not make allegations as to their authority. I cannot agree that because the indictment has set forth the

foregoing unnecessary allegation it must perforce continue with additional unnecessary allegations as to authority.

An order denying the motions here considered will be entered.