**UNITED STATES v. MINNEAPOLIS ELECTRICAL CONTRACTORS ASS'N et al.**

Crim. A. No. 8161.

United States District Court
D. Minnesota, Fourth Division.

· July 24, 1951.

Donald M. Wakefield and C. A. Taney, Jr., of Minneapolis, Minn., for Minneapolis Electrical Contractors Ass'n, Skeldon & Green Electric, Inc., L. Arthur Clausen, John Morris, and Claude Skeldon.

Donald M. Wakefield, of Minneapolis, Minn., for Midwest Electrical Council, Inc., and Gordon Tucker.

Gustav A. Larson and Felhaber & Larson, of St. Paul, Minn., for St. Paul Electrical Contractors Ass'n, Kehne Electric Co., Inc., Tieso & Kostka Electric Co., Donald F. Kehne and John Kostka.

Seth Lundquist and Victor J. Larson, of Minneapolis, Minn., for Midwest Electric Company and David A. Mandel.

Heinrich J. Kuhlman, of Minneapolis, Minn., for Northland Electric Supply Co.

Franklin D. Gray and Morley, Cant, Taylor, Haverstock & Beardsley, of Minneapolis, Minn., for Westinghouse Electric Supply Co.

Loring M. Staples and John S. Pillsbury, Jr., of Minneapolis, Minn. (Faegre & Benson, of Minneapolis, Minn., of counsel), for Graybar Electric Co.

Chester L. Nichols and Ralph H. Lee, of Minneapolis, Minn., for Local Union No. 292, International Brotherhood of Electrical Workers.

S. Robins and Robins, Davis & Lyons, of Minneapolis, Minn., for Local Union No. 110, International Brotherhood of Electrical Workers.

W. R. Poseley and Harroun, Anderson & Poseley, of Minneapolis, Minn., for Albert J. Fleming.

C. U. Landrum, U. S. Atty., and James J. Giblin, Asst. U. S. Atty., both of St. Paul, Minn., H. G. Morison, Asst. Atty. Gen., and Edward R. Kenney, Washington, D. C., and John H. Waters, Department of Justice, New York City, for the United States.

NORDBYE, District Judge.

The defendants have been indicted for conspiring and combining to restrain commerce in violation of the Sherman Anti-Trust Act, 15 U.S.C.A. § 1. Section I of the indictment names as defendants two trade associations of electrical contractors, an organization to which those trade associations belong, four jobbers of electrical equipment, three electrical contractors, two unions whose members perform electrical work, seven individuals who are or have been officials of the defendant organizations or electrical contracting firms, and one manufacturers' representative who deals in electrical equipment. Section II of the indictment alleges the existence of co-conspirators who are not identified except as "jobber co-conspirators", "contractor co-conspirators", "manufacturers representatives co-conspirators", and "union co-conspirators". Section III defines "Twin City area" (where the alleged conspiracy is alleged to exist) to mean Hennepin and Ramsey counties. "Electrical contractors" is defined as individuals or business enterprises which install, repair, or alter electrical equipment and sell it to the consumer. "Electrical jobbers" are defined as purchasers of electrical equipment from manufacturers for resale to electrical contractors and others. "Manufacturers representatives" are defined as agents for manufacturers of electrical equipment, and who solicit and accept orders for electrical equipment produced by the manufacturers. "Electrical equipment" is defined as all kinds of electrical equipment which is customarily affixed to or permanently installed in buildings by skilled labor, or other equipment used to provide a complete electrical lighting and power system in said buildings.

Section IV of the indictment alleges that 85% of the electrical equipment used and installed in the Twin City area is shipped into the area in interstate commerce from the states where it is manufactured, and that a substantial part moves in an uninterrupted stream from its place of origin in other states to its places of installation and use in the Twin City area structures. A major part of this equipment is sold and installed by the defendant electrical contractors and contractor co-conspirators, who employ and supervise skilled labor for that purpose.

Several channels or systems have been used to sell and distribute the equipment from the manufacturers to the consumers in the Twin City area. One channel is from manufacturer to jobber, jobber to electrical contractor, and electrical contractor to consumer. Both the jobber and electrical contractor there make an additional charge in connection with the sale and distribution of the equipment. The electrical contractor also makes an additional charge for installation of the equipment. Electrical equipment also may be sold by the manufacturer to the jobber or directly to the electrical contractor, and the jobber or contractor, as the case may be, then sells directly to the consumer. Under this system the jobber or electrical contractor omitted from the channel has no opportunity to profit by the sale to the consumer.

Electrical equipment also may be sold directly by the manufacturer to the consumers. Under this arrangement neither jobbers nor electrical contractors have opportunity to make a charge or obtain a sale profit.

In 1949 the contractor members of the defendant associations did gross business of approximately $7,000,000. In 1949 the defendant jobbers did gross business of approximately $4,500,000 in the Twin City area. More than 85% of this equipment was shipped to the Twin City area from other states.

The conspiracy is charged in Section V of the indictment, which alleges that from about February, 1945, and continuing to date of the indictment, the defendants, their co-conspirators, and others to the Grand Jury unknown, have engaged in an unlawful combination and conspiracy to establish and maintain an arbitrary and restricted system of distribution of electrical equipment in the Twin City area, whereby the electrical equipment would be sold by manufacturers only to jobbers, resold by jobbers only to electrical contractors, and resold by electrical contractors to the ultimate consumer in unreasonable restraint of the above noted commerce in electrical equipment among the states.

The alleged unlawful conspiracy to restrict the distribution of electrical equipment consisted of an agreement and concert of action among the defendants, the co-conspirators, and others to the Grand Jury unknown, in terms substantially as follows: Defendant jobbers and jobber co-conspirators would sell only to electrical contractors, not to consumers directly, and would refuse to sell to electrical contractors who bought directly from manufacturers. The defendant contractors and contractor co-conspirators would buy only from jobbers, not directly from manufacturers and would refuse to install equipment which the contractors did not sell. The defendant contractors and contractor co-conspirators would boycott or threaten to boycott both the jobbers who sold directly to consumers and the products of manufacturers who sold to jobbers who sold directly to consumers.

The defendant manufacturers representatives and co-conspirator manufacturers representatives were not to sell electrical equipment directly to electrical contractors or jobbers who sold directly to the consumers. They also were to persuade and induce manufacturers to refuse to sell electrical equipment directly to consumers and to jobbers who sold directly to consumers.

The members of defendant unions were to refuse to install electrical equipment not sold by an electrical contractor including electrical equipment which a consumer purchased directly from a jobber or manufacturer.

The purpose and intent of the conspiracy, Section VI of the indictment alleges, was to force consumers to pay a higher price for electric equipment, to discourage or prevent consumers from purchasing directly from manufacturers or jobbers, to discourage or prevent manufacturers from selling electrical equipment in commerce to contractors, to consumers, and to jobbers who sold directly to consumers; to exclude jobbers from business or handicap them unless they refused to sell directly to consumers, and to hinder, prevent, and restrain sale of electric equipment in commerce by methods other than from manufacturer to jobber, jobber to contractor, and contractor to consumer. The necessary effect of the conspiracy has been to accomplish its purpose. The conspirators have done the acts they agreed to do.

Section VII contains the required allegations of venue and jurisdiction in this Court.

The defendants attack the indictment generally upon the following bases:

(1) The indictment does not contain a plain, concise and definite written statement of the essential facts constituting the offense charged as required by Rule 7(c) of the Federal Rules of Criminal Procedure, 18 U.S.C.A.

(2) The indictment fails to charge any acts which constitute a restraint of commerce in violation of the Sherman Act, 15 U.S.C.A. §§ 1–7, 15 note, because the restraints alleged are reasonable, not unreasonable.

(3) The indictment fails to allege a complete conspiracy because the facts alleged are insufficient to connect the various defendants in the same conspiracy.

(4) The indictment fails to establish that the conspiracy affected anything other than intrastate commerce. It does not show that interstate commerce was affected. The effect upon interstate commerce was at most remote, incidental, and indirect.

In addition, the defendant contractor associations contend that, even if the indictment is sufficiently plain and concise and definite as to the others, it is not such as to them. And the defendant unions contend that the object of the alleged activity of the unions was legal for the unions to pursue.

■■■■ Rule 7(c) of the Federal Rules of Criminal Procedure provides that the indictment "shall be a plain, concise and definite written statement of the essential facts constituting the offense charged." This rule is satisfied if the indictment, when construed as a whole, informs the accused of the nature of the charges against him so that the defendant can prepare a defense and, later, be able to plead double jeopardy. United States v. Josephson, 2 Cir., 1947, 165 F.2d 82, 83, at page 85, certiorari denied 333 U.S. 838, 68 S.Ct. 609, 92 L.Ed. 1122; United States v. Northeast Texas Chapter, etc., 5 Cir., 1950, 181 F.2d 30; United States v. Armour & Co., 10 Cir., 1943, 137 F.2d 269; Wilson v. United States, 5 Cir., 1947, 158 F.2d 659, certiorari denied 330 U.S. 850, 67 S.Ct. 1095, 91 L.Ed. 1294. Although an anti-trust indictment may be subject to dismissal if the defendant is charged only in terms of the Sherman Act, Frankfort Distilleries, Inc., v. United States, 10 Cir., 1944, 144 F.2d 824, reversed on other grounds, 324 U.S. 293, 65 S.Ct. 661, 89 L.Ed. 951, it is fundamental that the indictment need not be detailed or evidentiary.

Here, the Government has alleged specifically that defendants have violated the Sherman Act, and the indictment sets forth that the defendants agreed that a designated system of distribution should be used in order to accomplish certain specified purposes, including the obtaining of higher prices, and in order to achieve certain specified effects which were intended by the defendants. The substantial terms of the alleged agreement are set forth as well as the purpose which was sought to be accomplished. The allegations go far past the mere words of the statute and apprise the defendants of the agreements charged against them so that they can recognize what the Government claims were the terms of the conspiracy and what conspiracy was involved. To require the indictment to contain the detail now sought by defendants would render the indictment considerably evidentiary and would make purposeless the rules permitting the bill of particulars which defendants also seek and to which the Government has responded by producing certain documentary evidence dealing with the alleged violations. Rule 7(c) has not been violated.

■■■■ The defendant trade associations contend that the only allegation against the trade associations is made in Section V of the indictment, which contains only a general allegation of an anti-trust violation together with allegations of the specific parts which were to be played by the defendants other than the trade associations. The trade associations contend that this allegation is insufficient, as to the associations. But the indictment must be read as a whole, not by sentences. United States v. Armour & Co., 10 Cir., 1943, 137 F.2d 269. So read, it is apparent that the indictment charges the trade associations with being parties to the agreement and conspiracy to create and maintain the alleged distribution system with the purpose and intent to accomplish allegedly illegal results. The conspiracy with which they are charged is set forth just as clearly as to them as it is as to the other defendants. All defendants are charged with the same conspiracy and by the same allegations. Because the alleged terms of the conspiracy do not set forth that the trade associations were to do acts in furtherance of the conspiracy does not mean they were not parties to a conspiracy to do given acts and accomplish stated illegal purposes. The gist of the indictment under the Sherman Act is a conspiracy, not an act in furtherance of it. No act need be done in order for a violation of the Sherman Act to exist. This is fundamental. Consequently, the indictment's failure to charge the defendant trade associations with a specific act in carrying

out the conspiracy does not mean they are not charged with conspiracy. Their relationship to the conspiracy is sufficiently alleged, and no open end conspiracy appears to exist.

Defendants correctly urge that the restraint must be against interstate commerce, and that the restraint must be one which violates the Sherman Act. But their arguments concerning application of that requirement to the instant indictment are not persuasive. The alleged plan was to establish and to enforce a designated distribution system for electrical equipment consumed in the Twin City area. A substantial amount of this equipment was transported in interstate commerce from its place of manufacture to its place of consumption in the Twin City area. According to the indictment, the defendants intended by the conspiracy to establish this distribution system to force consumers to pay a higher price for the electrical goods, to discourage the consumers and manufacturers from dealing directly with each other, and to interfere with or prevent jobbers from doing business (including interstate business) directly with consumers. The plan was to adopt a given distribution and to force adherence by everyone to that system. To do this the defendants allegedly agreed that those who did not abide by defendants' plan should not be patronized or should be forced out of business through boycott, threats of boycott, persuasion, and other practices. The planned means for assuring success of the single distribution system was, according to the indictment, as much a part of the conspiracy as the establishment of the system. The effect was to prevent business from being done by those who did not conform to defendants' distribution propositions. The desired system and the means for establishing it were a part of the same agreement and conspiracy. That the conspiracy was a restraint upon an open and competitive market upon the allegations of this indictment and in its various parts was per se unlawful or unreasonable in fact must be the Court's conclusion. United States v. Columbia Steel Co., 334 U.S. 495, 522, 68 S.Ct. 1107, 92 L.Ed. 1533;

Binderup v. Pathe Exchange, 263 U.S. 291, 44 S.Ct. 96, 68 L.Ed. 308; Hunt v. Crumboch, 325 U.S. 821, 824, 65 S.Ct. 1545, 89 L.Ed. 1954; Fashion Originators Guild v. F. T. C., 312 U.S. 457, 61 S.Ct. 703, 85 L. Ed. 949; Eastern States Retail Lbr. Ass'n v. United States, 234 U.S. 600, 612–614, 34 S.Ct. 951, 58 L.Ed. 1490.

Defendants' claim that intrastate, not interstate, commerce is involved under this indictment is not helpful to them. The contractors and jobbers were mere conduits for the electrical equipment, according to the indictment. The mere fact that the electrical goods were used locally does not mean that the interstate commerce required for violation of the Sherman Act did not exist. As pointed out in United States v. Women's Sportswear Mfg. Ass'n, 1948, 336 U.S. 460, at page 464, 69 S.Ct. 714, at page 716, 93 L.Ed. 805, "The source of the restraint may be intrastate, as the making of a contract or combination usually is; the application of the restraint may be intrastate, as it often is; but neither matters if the necessary effect is to stifle or restrain commerce among the states." The indictment alleges the existence of the commerce and its restraint. Compare United States v. Northeast Texas Chapter, etc., 5 Cir., 1950, 181 F.2d 30.

The defendant unions urge that the activities were proper union activities so far as the unions were concerned, and that, according to the indictment, the unions only agreed to "persuade", not to boycott, etc. But the indictment also charges that the union was a party to the over-all conspiracy. That conspiracy, not one of the union's assigned acts under it, is the heart of the indictment. Likewise, nothing in the indictment's allegations shows that the labor union was engaging in the alleged conspiracy in pursuit of their legitimate functions as a labor union. The cases cited by the unions, including United States v. Hutcheson, 312 U.S. 219, 61 S.Ct. 463, 85 L.Ed. 788, and Apex Hosiery Co. v. Leader, 310 U.S. 469, 60 S.Ct. 982, 84 L.Ed. 1311, do not aid the unions on this motion under this indictment.

After careful consideration of the arguments presented by the defendants herein,

including those not specifically noted herein, the above premises require a denial of their motion to dismiss the indictment in this proceeding. It is so ordered.

An exception is reserved to each defendant.