**LAS VEGAS MERCHANT PLUMB-
ERS ASS'N**

v.

**UNITED STATES.**

No. 13218.

United States Court of Appeals,
Ninth Circuit.

Feb. 1, 1954.

Rehearing Denied March 22, 1954.

Alexander H. Schullman, Richard Richards, Los Angeles, Cal., David Zenoff, John W. Bonner, Las Vegas, Nev., for appellants.

Wallace Howland, Special Asst. to Atty. Gen., Don H. Banks, Arthur H. Tibbits, Trial Attorneys, Joseph C. Putnam, Harold Haidt, San Francisco, Cal., Attys., Anti-Trust Division, San Francisco, Cal., James W. Johnson, Jr., U. S. Atty., Reno, Nev., for appellee.

Before HEALY and BONE, Circuit Judges, and JAMES M. CARTER, District Judge.

JAMES M. CARTER, District Judge.

This is an appeal by eleven defendants following conviction by a jury of violations of the Sherman Anti-Trust Act, 15 U.S.C.A. §§ 1–7, 15 note. The appellants consist of four corporations and seven individuals.[1] Fines were imposed on all appellants; three of the individual appellants were also sentenced to terms of six months in the custody of the Attorney General. All have appealed. The appeals are presented on one record but appellant Alsup has filed a separate notice of appeal and separate briefs.

## I.

The Sufficiency of the Indictment

All appellants contended in the trial court and contend here that the indictment does not state facts sufficient to constitute an offense against the United States.

The indictment in Sec. I, identifies the defendants [appellants herein] and in

---

1. Las Vegas Merchant Plumbers Association, referred to as the "Association" and Merchant Plumbers Exchange, Inc., referred to as the "Exchange" are corporations. The defendants A. R. Ruppert Plumbing & Heating Company, a corporation, United Plumbing and Heating Company, a corporation, Cohen, Hynds, McGarvie, and Provenzano, are plumbing contractors and members of the "Asso-

ciation" and the "Exchange". A. R. Ruppert is President of the Ruppert Company and Joe Davis is President of the United Company. Both Ruppert and Davis held an office in the "Association" or the "Exchange". Alsup is business representative and financial secretary of Local 525, of the Plumbers Union in Las Vegas.

Sec. II sets forth definitions of terms. In Sec. III, set forth in the margin,[2] the trade and commerce involved is described.

In summary it alleges: Practically all plumbing and heating supplies used in southern Nevada are manufactured in other States and are sold and shipped in interstate commerce into Nevada. Plumbing contractors then distribute, sell and install these supplies and make a charge and obtain a profit from both the selling and installing; over three-fourths of all such supplies so used in southern Nevada are distributed, sold and installed by plumbing contractors who are members of the defendant association and defendant exchange, and a major part of all such supplies are distributed, sold and installed by the defendant plumbing contractors. The service performed by plumbing contractors in distributing, selling and installing such supplies is an integral part of, and necessary to the movement in interstate commerce of such supplies; plumbing contractors are conduits for such movement, such supplies flow in a continuous uninterrupted stream from points of origin out of state to places of use and installation in southern Nevada.

2. "Trade and Commerce Involved.

"12. Practically all of the plumbing and heating supplies used in Southern Nevada are manufactured in States other than the State of Nevada, and are sold and shipped in interstate commerce from said States to the State of Nevada for use there.

"13. Plumbing contractors in Southern Nevada are engaged in the business of distributing, selling and installing plumbing and heating supplies, and make a charge and obtain a profit both from the sale of said supplies and from their services in installing the same. Over three-fourths of all plumbing and heating supplies used in Southern Nevada are distributed, sold and installed by plumbing contractors who are members of defendant Association and defendant Exchange and a major part of all said plumbing and heating supplies are distributed, sold and installed by defendant plumbing contractors.

"14. Manufacturers and wholesalers located in States other than the State of Nevada, sell and ship directly to plumbing contractors in Southern Nevada more than 40 per cent of all plumbing and heating supplies which are purchased by said plumbing contractors.

"15. The remainder of the plumbing and heating supplies purchased by said plumbing contractors are obtained from wholesalers located in Southern Nevada, who purchase plumbing and heating supplies from out-of-state sources for resale to said plumbing contractors and other customers. Substantial quantities of plumbing and heating supplies sold by said Southern Nevada wholesalers to plumbing contractors are shipped from out-of-state sources directly to plumbing contractors in Southern Nevada. Substantial quantities of plumbing and heating supplies are purchased from out-of-state sources by the said Southern Nevada wholesalers in response and pursuant to prior orders placed with said wholesalers by plumbing contractors and, upon receipt of said supplies from out-of-state sources, said supplies are immediately delivered to the plumbing contractors who ordered the same.

"16. Substantial quantities of plumbing and heating supplies are shipped from manufacturers, wholesalers or other sources outside of the State of Nevada, directly to the job site or place where the same are installed by plumbing contractors in Southern Nevada.

"17. Consumers of plumbing and heating supplies ordinarily do not install said supplies, and this service customarily is performed by a plumbing contractor, who employs and supervises skilled labor for this purpose. The service performed by plumbing contractors in Southern Nevada, including defendant plumbing contractors, in distributing, selling and installing plumbing and heating supplies is an integral part of, and necessary to, the movement in interstate commerce of plumbing and heating supplies which are manufactured in States other than Nevada, and which are distributed, sold and installed in Southern Nevada. Thus, plumbing contractors, including those named as defendants herein, are conduits through which plumbing and heating supplies manufactured in and shipped from States of the United States other than the State of Nevada, are sold and distributed to the consuming public in Southern Nevada. Said plumbing and heating supplies flow in a continuous, uninterrupted stream from their points of origin in States other than Nevada, to their places of installation and use in buildings in Southern Nevada."

Sec. IV of the indictment describes the offense charged. It alleges that beginning in August 1950, and continuing until the return of the indictment [March 27, 1951] the defendants named and others unknown, have conspired to unreasonably suppress and eliminate competition in the sale and distribution of plumbing and heating supplies in restraint of the interstate trade and commerce described, in violation of Sec. 1 of the Sherman Act, 15 U.S.C.A. § 1. It then describes a scheme to fix prices and to divide the available market by the employment and use of an "estimator" who would figure a plumbing job and fix the price, to which the plumbing contractors would adhere. If two or more plumbing contractors were to bid on the job an allocation committee would designate who should submit the lowest bid. Complimentary and factitious bids at higher prices would be used. To enforce compliance with and adherence to the plan, defendant [appellant] Alsup would induce journeymen and apprentice plumbers not to work on any job for any plumbing contractor other than the one designated; that wholesalers would be boycotted if they sold or offered to sell such supplies at prices and terms not agreeable to defendant plumbing contractors.

Sec. V of the indictment alleges that the effect of the conspiracy charged has been to "directly, unreasonably, arbitrarily and unlawfully restrain and obstruct the flow of plumbing and heating supplies in interstate commerce into southern Nevada" by:

(a) suppressing and eliminating competition among plumbing contractors in the sale, distribution and installation of plumbing and heating supplies by fixing prices for both the supplies and the subsequent installation of such supplies;

(b) narrowing and restricting the market in which builders, owners and other consumers are able to purchase such supplies in southern Nevada.

Sec. VI of the indictment alleges jurisdiction and venue.

Appellants have summarized their attack on the sufficiency of the indictment, as follows:

(1) The trial court failed to distinguish between intrastate and interstate commerce in denying the motion to dismiss the indictment.

(2) The indictment shows on its face that the plumbing contractors are engaged in the sale, distribution and installation of fabricated plumbing and heating systems rather than the re-sale or distribution of any specific item of such supplies.

(3) The fact that plumbing contractors are essential for the installation of plumbing and heating supplies shipped in interstate commerce is not sufficient to bring appellants within the purview of the Sherman Act.

(4) The allegations with respect to the flow of plumbing and heating supplies are insufficient to charge a violation of the Sherman Act.

In the enactment of the Sherman Act Congress exercised its full power over interstate commerce. U. S. v. Frankfort Distilleries, 1945, 324 U.S. 293, 298, 65 S.Ct. 661, 89 L.Ed. 951; U. S. v. Southeastern Underwriters Ass'n, 1944, 322 U.S. 533, 558, 64 S.Ct. 1162, 88 L.Ed. 1440; U. S. v. Chrysler Corp., etc., infra.

The Sherman Act therefore extends not only to transactions in the stream of interstate commerce, but also to intrastate transactions which substantially affect [3] interstate commerce. U. S. v.

---

3. The word "affect" is used in two different situations under the antitrust laws. A case under the antitrust laws, so far as the interstate commerce element is concerned may rest on one or both of two theories:

(1) That the acts complained of, occurred within the flow of interstate commerce. This is generally referred to as the "in commerce" theory.

(2) That the acts complained of, occurred wholly on the state or local level, in intrastate commerce, but substantially affected interstate commerce.

Under both of these theories, the transactions complained of must affect or have

Chrysler Corp., etc., 180 F.2d at page 560 infra; Mandeville Island Farms, Inc., v. American Crystal Sugar Co., 1948, 334 U.S. 219, 235, 68 S.Ct. 996, 92 L.Ed. 1328.

A. The indictment sufficiently alleges restraint of the flow of commodities *in* interstate commerce

■ The sufficiency of the "in commerce" allegations of the indictment rests on the allegations showing the stream of commerce from out of state manufacturers and suppliers, thru the plumbing contractor as conduits to the final use and installation of the supplies in southern Nevada.

The single allegation that plumbing contractors are essential for the installation of plumbing supplies shipped in interstate commerce, is not the whole indictment as appellants' argument [2 above] would infer, but is part of the "conduit" or commerce allegations.

The allegations of the indictment which allege restraint on the flow of plumbing supplies in interstate commerce are clearly sufficient. Comparable allegations as to restraints on the flow of commerce were found sufficient in U. S. v. Chrysler Corp. Parts Wholesalers, 9 Cir., 1950, 180 F.2d 557, 559. U. S. v. General Motors Acceptance Corp., 7 Cir., 1941, 121 F.2d 376, 401, certiorari denied 314 U.S. 618, 62 S.Ct. 105, 86 L.Ed. 497; Lake Valley Farm Products, Inc., v. Milk Wagon Drivers Union, 7 Cir., 1940, 108 F.2d 436, 440, reversed on other grounds 311 U.S. 91, 61 S.Ct.

122, 85 L.Ed. 63; U. S. v. Mountain States Lumber Dealers Ass'n, D.C.Colo. 1941, 40 F.Supp. 460, 461.

■ In Standard Oil Co. v. Federal Trade Commission, 7 Cir., 1949, 173 F.2d 210, 214, reversed on other grounds, 340 U.S. 231, 71 S.Ct. 240, 95 L.Ed. 239, Justice Minton, then on the Seventh Circuit, stated:

"* * * The modern concept of commerce is one which gives full sweep to the commerce clause of the Constitution within the limits of the implementing statute, a liberal view of the Congressional purpose as expressed in the statute, and a realistic view of what business is doing as it moves across state lines to accomplish its purpose. The late cases support the view that the petitioner's operations are in commerce from the refinery to its customers."

This concept was expressly affirmed by the Supreme Court, 340 U.S. 231, 236–238, 71 S.Ct. 240, 95 L.Ed. 239, although the case was reversed on a wholly different ground. Also: U. S. v. Minneapolis Elec. Contractors Ass'n, D.C.Minn.1951, 99 F.Supp. 75, 79. U. S. v. Universal Milk Bottle Service, Inc., D.C.Ohio 1949, 85 F.Supp. 622, 629, affirmed 6 Cir., 1951, 188 F.2d 959.

■ Price fixing agreements are unreasonable per se—U. S. v. Socony-Vacuum Oil Co., 1940, 310 U.S. 150, 223, 60 S.Ct. 811, 84 L.Ed. 1129.

*an effect* on interstate commerce or the requirements of the statute are not satisfied. Under the "in commerce" theory, the ultimate effect on interstate commerce is the impact on that commerce under a qualitative and not a quantitative test. If there is price fixing or division of the market involved, there are violations per se, as a matter of law. Where there is involved no price fixing or division of the market, the effect of the transactions complained of may be a question of law or a mixed question of law and fact.

Turning to the second alternative, where acts wholly within intrastate commerce substantially affect interstate commerce, these intrastate acts may occur before

goods enter the flow of commerce, or after they leave the flow of commerce. Here we have a question of fact as to whether the wholly intrastate acts substantially affect the flow of commerce.

After determination of the issue as to whether the wholly intrastate acts substantially affect the flow of commerce, we then reach the same problem that is reached under the "in commerce" theory, namely the ultimate effect or impact of the acts complained of on interstate commerce and again the test is a qualitative one and not a quantitative test, and again is a question of law, or a mixed question of law and fact.

Agreements to divide a market for products moving in interstate commerce are unreasonable per se, Addyston Pipe & Steel Co. v. U. S., 1899, 175 U.S. 211, at page 241–245, 20 S.Ct. 96, 44 L.Ed. 136. If an indictment alleges the flow of goods in interstate commerce and charges price fixing or a dividing up of the market for such goods, then the final effect of such illegal activities on such commerce and the substantiality of that effect becomes a question of law under the facts alleged. The indictment here alleges such a substantial effect.

B. The indictment sufficiently alleges that conspiracy therein charged, even if purely local or intrastate in nature, nevertheless *affected* interstate commerce in the flow of plumbing supplies

■ In our case the indictment, in Sec. V, alleges that the effect of the conspiracy charged has been and is to "directly, unreasonably, arbitrarily and unlawfully restrain and obstruct the flow of plumbing and heating supplies in interstate commerce into southern Nevada, by:

"(a) suppressing and eliminating competition * * *

"(b) narrowing and restraining the market * * *."

The allegation is similar to an allegation which this court held sufficient as showing an effect on interstate commerce in U. S. v. Chrysler Corp. Parts Wholesalers, 180 F.2d at page 560, supra.[4]

C. An effect on interstate commerce is present whether the restraints are applied before the interstate journey starts or after it ends.

■ Production and manufacturing processes are not necessarily outside the scope of the Act.

■ Restraints imposed in advance of the interstate movement affect commerce. Addyston Pipe & Steel Co. v. U. S., supra; U. S. v. General Motors Corp., 7 Cir., 1941, 121 F.2d 376, certiorari denied 314 U.S. 618, 62 S.Ct. 105, 86 L.Ed. 497; Mandeville Island Farms, Inc., v. American Crystal Sugar Co., supra.

Restraints imposed after the interstate movement has terminated, affect commerce. Eastern States Retail Lumber Dealers v. U. S., 1931, 234 U.S. 600, 34 S.Ct. 951, 58 L.Ed. 1490; Montrose Lumber Co. v. U. S., 10 Cir., 1941, 124 F.2d 573, 578; U. S. v. Minneapolis Electrical Contractors Ass'n, D.C.Minn.1951, 99 F.Supp. 75; U. S. v. Northeast Texas Chapter, N.E.C.A., 5 Cir., 1950, 181 F.2d 30; Local 167 International Brotherhood of Teamsters v. U. S., 1934, 291 U.S. 293, 54 S.Ct. 396, 78 L.Ed. 804.

■ Appellants contend that the defendant plumbing contractors fabricated articles of plumbing which were then installed and hence the activities of appellants are outside the scope of the Sherman Act. First, the sufficiency of the indictment on a motion to dismiss is tested by its allegations. Appellants, on the consideration of such a problem, cannot suppose or inject into the case what they think the facts may or did show at trial.

■ Secondly, and more fundamentally, even if it be conceded that the indictment shows fabrication of plumbing systems this no longer bars the way for an application of the Sherman Act if the acts complained of in the indictment affect interstate commerce.[5] The

---

4. United States v. Starlite Drive-In, Inc., 7 Cir., 1953, 204 F.2d 419, holds to the contrary, viz., that the "effects" alleged are conclusions of law, but does not cite the Ninth Circuit case referred to in the text, United States v. Chrysler Corp. Parts Wholesalers. In view of the simplified pleading of the federal system, the Ninth Circuit ruling seems preferable.

5. In U. S. v. Detroit Sheet Metal & Roofing Contractors Ass'n, Inc., D.C.Mich. 1953, 116 F.Supp. 81, an indictment was held sufficient which alleged that intrastate activities affected interstate commerce. The facts alleged are similar to the instant case, in that it involved a Roofing Association, six building contrac-

Mandeville Island Farms case, supra— 334 U.S. at page 241, 68 S.Ct. 996, rejected a contention similar to appellants.

"The broad form of respondent's argument cannot be accepted. It is a reversion to conceptions formerly held but no longer effective to restrict either Congress' power, Wickard v. Filburn, 317 U.S. 111, 63 S. Ct. 82, 87 L.Ed. 122, or the scope of the Sherman Act's coverage. The artificial and mechanical separation of 'production' and 'manufacturing' from 'commerce,' without regard to their economic continuity, the effects of the former two upon the latter, * * * no longer suffices to put either production or manufacturing and refining processes beyond reach of Congress' authority or the statute." 334 U.S. at pages 228–229, 68 S.Ct. 996, 1002.

United States v. San Francisco Electrical Contractors Ass'n, D.C.N.D.Cal. 1944, 57 F.Supp. 57, relied on by the appellants is not controlling. The sufficiency of the indictment was not considered in the opinion. In fact, a demurrer to the indictment had been overruled previously by the court. A dismissal of the indictment was granted as to each defendant, on the ground that *the evidence* did not show a restraint of interstate commerce.

The court stated that "activities strictly local which interfere with interstate commerce, come under the interdiction of the Act" 57 F.Supp. at page 60 * * * and "Direct control of prices of articles moving in interstate commerce, no matter how achieved, either in the state of origin, or in the state of destination, is a restraint with-

in the Sherman Act, because it eliminates competition. * * * " 57 F.Supp. at page 61. But the court held that the evidence presented did not show that the acts complained of had a direct and substantial effect upon the volume of electrical equipment moving in interstate commerce as charged in the indictment, 57 F.Supp. at page 64, and that if any interference with interstate commerce existed, it was indirect and unsubstantial, 57 F.Supp. at page 68. The case cannot be considered as authority for the proposition that the mere fabrication of supplies by the addition of labor thereto prevents the activity complained of from coming within the possible scope of the Sherman Act. The contrary was clearly demonstrated in the Mandeville Island Farms case, supra.

We conclude that appellants' contention that the indictment does not allege a violation of the Sherman Act is without merit.

## II.

### The Sufficiency of the Evidence
#### (A) *Commerce*

The verdict of a jury will be sustained if there is any substantial evidence in the record to support it. In determining whether the evidence is sufficient to support the verdict, we must consider the evidence in the light most favorable to the government. Glasser v. U. S., 1942, 315 U.S. 60, 69, 62 S.Ct. 457, 86 L.Ed. 680; Woodard Laboratories, Inc., v. U. S., 9 Cir., 1952, 198 F.2d 995.

The credibility of the witnesses and the probative force of facts introduced in evidence are within the sole province of the jury. Craig v. U. S., 9 Cir., 1936, 81 F.2d 816, at pages 827,

tors and twelve individuals associated with nine corporate defendants.

But see Howard v. Local 74, etc., (U. S. v. Employing Lathers Ass'n of Chicago and U. S. v. Employing Plasterers Ass'n of Chicago), D.C.Ill., 118 F.Supp. 387, where the District Court held indictments did not state an offense under the antitrust laws. The defendants were the associations, the Union and its officials. The court held no effect on interstate

commerce had been alleged and characterized the matters complained of as "wholly a charge of local restraint and monopoly".

On Nov. 30, 1953, the U. S. Supreme Court noted probable jurisdiction in each of the cases, No. 439 and No. 440, respectively, on the Supreme Court's docket, and placed them on the summary calendar, 346 U.S. 894, 74 S.Ct. 227.

828; Coplin v. U. S., 9 Cir., 1937, 88 F.2d 652 at page 664; Morrissey v. U. S., 9 Cir., 1933, 67 F.2d 267, certiorari denied 293 U.S. 566, 55 S.Ct. 77, 79 L. Ed. 666.

■ There was substantial evidence to support the trade and commerce elements of the indictment. No plumbing and heating supplies used in southern Nevada were manufactured in that state. The plumbing and heating supplies moved in interstate commerce into Nevada from eastern factories or warehouses in California. Approximately 90% of the supplies reached the ultimate consumer through plumbing contractors. Part went to the plumbing contractors directly, part through one wholesaler in southern Nevada. 46% of all supplies purchased by plumbing contractors were shipped directly to them from out of state.

In addition the plumbing contractors also secured for resale, materials from the local wholesaler. He endeavored to keep his inventory to a minimum and frequently ordered a year ahead. The record shows frequent transactions and a constancy of the flow of materials into this wholesaler's warehouse. 79% of his sales were to plumbing contractors in southern Nevada.

7.3% of the supplies secured by contractors from the local wholesaler, amounting to $14,000 were specific prior or special orders placed by contractors through this wholesaler. It was the practice to place the name of the plumbing contractor on his purchase order so that the contractor could be notified on the arrival of the goods.

In addition, substantial quantities of supplies sold by this wholesaler to plumbing contractors were shipped by his out of state sources directly to plumbing contractors on his order. These resales alone amounted to 2% of his total sales of $437,000, which in itself is not insubstantial. The evidence showed recurring cycles of ordering and receiving supplies by the wholesaler to meet the demands of the plumbing contractors upon him.

The indictment alleged that the contractors were engaged in the business of distributing, selling and installing the plumbing supplies. There was evidence that dollarwise, two to three times as much profit was derived from the furnishing and selling of the supplies as from the labor involved in their installation.

An order for $42,800 worth of plumbing supplies was shipped to the job site of the Las Vegas Race Track from a Los Angeles supplier, for use by a Los Angeles plumbing contractor, not a party to the conspiracy. The job had been allotted by appellants to one of their number but when the Los Angeles contractor received the contract award, two of appellants asked Alsup, the plumbers' business agent to "protect" them and for several months plumbers refused to work on the job. Here was direct evidence of the impact of the conspiracy on interstate commerce.

The conspiracy to fix prices and divide up jobs, to be hereafter discussed, substantially affected this interstate commerce in plumbing and heating supplies.

### (B) *The Conspiracy*

■ There was ample proof of the conspiracy which began with a meeting in the living quarters of one of the appellant plumbing contractors, at which all individual appellants were present, as was also Alsup, the business agent for the Plumbers Union. There was discussed an organization of plumbing contractors to work out prices, set up a central estimating bureau allocating 2% of each estimated price to defray bureau expenses, and to estimate time necessary to install fixtures. An estimator was to be employed. Another meeting followed and an allocation committee was set up for allocating jobs as they came through. Jack Swan commenced his work as common estimator, and his salary was paid from the funds of the appellant Association. The appellant Exchange was thereafter incorporated. Thereafter Swan was paid by the Exchange.

The evidence clearly shows the existence and operation of the allocating committee and the method by which the jobs were assigned to one or the other of the contractors. Swan kept a note book showing how the jobs were assigned. Prices were fixed, by reference to a formula. Swan priced the materials and then estimated the cost of labor and then added overhead and profit. There was clear evidence of agreement by the appellant contractors to establish this system and to abide by the price determined by the common estimator.

Complimentary bidding by members of the Exchange, other than the one designated to get the job, was engaged in. During the course of the conspiracy certain of the contractors asked Alsup to protect them in connection with the Las Vegas race track, and thereafter a general strike was called. It developed that the cause of the strike was a dispute between a general contractor and the Carpenters' Union. However, there was specific evidence that through Alsup's activity, certain appellant contractors had no difficulty in obtaining plumbers on jobs, but that an outside contractor not a party to the conspiracy alleged had considerable difficulty in obtaining men on his job. The evidence was clear and convincing concerning the nature of the conspiracy, its operation and its effect on interstate commerce. We hold that the evidence clearly supported the verdict.

### III.

#### Alleged Errors in Instructions Concerning the Sherman Act

(A) *Rule 30, Federal Rules of Criminal Procedure,* 18 U.S.C.

 A problem arises as to whether appellants complied with Rule 30, Federal Rules of Criminal Procedure in making objections to instructions. At the Conference on settlement of instructions, the trial judge read Rule 30, advised counsel of what instructions he was going to give and then stated to counsel:

"So I think it might be well if counsel now for both the government and the defendants * * * would first make objections which they may have to any of these proposed instructions * * * (which the court had stated it would give) and then * * * take exceptions to the refusal of the court to give certain specified requested instructions and we can have them identified so they may become part of the record. * * * Then after the arguments the court will instruct the jury and before the jury retires, counsel may approach the bench * * * and then you may by reference and adoption, adopt the same grounds that you have made at this time, to avoid delay. * * Is that arrangement satisfactory?"

All Counsel: "Yes, Your Honor."

At the conclusion of the court's charge to the jury, the court said at the bench to counsel:

"I think it might be understood for the record that all objections and exceptions heretofore taken by respective counsel for the defendants will be considered as if they were now made at this time and entered in the record and have the same force and effect as if repeated on the grounds heretofore given."

All Counsel: "So stipulated."

Counsel for appellants then stated other and further objections to the instructions given and refused.

The procedure shown above is substantially that often used by district judges in their compliance with Rule 30. It saves time. It is generally acceptable to counsel and opportunity is given for further objections, in addition to those previously made and incorporated by reference.

Ziegler v. U. S., 9 Cir., 1949, 174 F.2d 439, 448, certiorari denied 338 U.S. 822, 70 S.Ct. 68, 94 L.Ed. 499, first cast a possible doubt on this procedure. In that case the trial court, before giving the instructions, informed counsel of its proposed action but no objection was made by defendant. The court on ap-

peal, however, used language inferring that objections made "before the charge was given" was not a compliance with Rule 30.

Later in Remmer v. U. S., 9 Cir., 1953, 205 F.2d 277, the same circuit distinguished the Ziegler case in Note 16, page 290, and approved the same procedure followed in the instant case.

We do not regard Kobey v. United States, 9 Cir., 1953, 208 F.2d 583 as disapproving the procedure followed in the instant case, or as overruling the Remmer case. In the Kobey case there was not an arranged procedure for incorporation by reference but merely a general, all-inclusive objection. The cases cited in footnote 3 of the Kobey case are good law to the effect that objection must be made to instructions and that a general objection is not good but that the objection must be specific. The Remmer case is not cited.

We consider the Remmer case as expressly approving the procedure followed in the trial of the instant case, and hold the procedure proper under Rule 30, Federal Rules of Criminal Procedure.[6]

### (B) *Rule 18(2) (d) of this Court*

■ Appellants have failed to comply with Rule 18(2) (d) of this court in presenting the instruction problem in their brief. The rule requires "when the error alleged is to the charge of the court, the specification shall set out the part referred to *totidem verbis*, whether it be instructions given or in instructions refused, together with the grounds of the objections urged at the trial."

Reference by summary and number is made by appellants to certain instructions. The grounds of objection we find only by a search of the record. Some of the instructions complained of were not objected to before the trial court and in the case of others, the objections stated to the trial judge were meaningless and of no assistance to that court.

### (C) *The Instructions*

However, we proceed to examine the instructions. We have already held the commerce allegations of the indictment sufficient as alleging the commission of acts which unreasonably restrained that commerce either under the "in" or the "affect" commerce theory.

Government counsel apparently thought he was proceeding on two alternative theories at the trial:—First, that the proof would show, that the plumbing contractors were "conduits" and that there was a continuous and uninterrupted flow of plumbing supplies *in* interstate commerce from out of state into southern Nevada to their place of use or installation, and that the acts complained of unreasonably restricted the flow of such commerce. Second, and alternatively, that even if the interstate commerce ended with the plumbing contractor and if the activities of the plumbing contractors complained of were purely intrastate activities, nevertheless their activities unreasonably and substantially affected the flow of interstate commerce. The government asks us to sustain the conviction on both grounds.

As to whether both theories are available in support of the conviction we shall now see.

### The "in" commerce theory

■ The court properly left to the jury the questions as to whether the flow of materials was from out of state, and was through the conduit of the plumbing contractors and was *in* commerce, and whether the appellants agreed to fix prices or allocate jobs.

Instruction 25 reads, in part:

"The indictment alleges that there exists a flow of commerce from manufacturers of plumbing and

6. The court in the Ziegler case consisted of *Mathews*, Stephens, and Driver (District Judge). The court in the Remmer case consisted of Mathews, Stephens and *Orr*.

The court in the Kobey case consisted of Mathews, Orr and *Lemmon* (District Judge). [Judge italicized wrote opinion]

heating supplies located outside of Nevada to their place of installation and use in buildings in southern Nevada and that the plumbing contractors are conduits through which these supplies manufactured and shipped from other states are sold and distributed to the consuming public in southern Nevada. It is for you to decide whether this allegation is true beyond a reasonable doubt. * * * "

Instruction 23 reads, in part:

"In order to violate the Sherman Act, the activities of the defendants must affect commodities which move in interstate commerce. I charge you that if you find that the trade and commerce in plumbing and heating supplies is as alleged in the indictment, and if you further find that defendants agreed to fix the prices to be used by plumbing contractors in submitting bids for the sale and installation of such supplies or that they agreed upon a particular contractor to furnish such supplies on a specific job, then violation of the Sherman Act has been established. * * * "

While instructions refused are not asserted as error except by listing the numbers, we have examined them as they apply to this aspect of the case, and find no error.

### The "affect" commerce theory

■ "The injury, and hence the power, (to regulate intrastate transactions) does not depend upon the fortuitous circumstance that the particular person conducting the intrastate activities is, or is not, also engaged in interstate commerce." U. S. v. Wrightwood Dairy Co., 1942, 315 U.S. 110, 121, 62 S.Ct. 523, 527, 86 L.Ed. 726 (our insertion). "If it is interstate commerce that feels the pinch, it does not matter how local the operation which applies the squeeze." U. S. v. Women's Sportswear Manufacturers Ass'n, 1949, 336 U.S. 460, 464, 69 S.Ct. 714, 716, 93 L.Ed. 805.

■ There are several instructions which squint at the "affect commerce" theory. To sustain the conviction on this theory it would be necessary that the jury be given at least basic instructions as to the law pertaining to the theory and basic instructions which presented the appellants' defense, leaving to the jury to decide whether appellants' activities were wholly intrastate and whether such activities nevertheless affected interstate commerce. The question of this "affect" is a question of fact.

■ Thus instruction No. 23 stated in part that if the jury found an agreement existed to fix prices or divide up jobs, then violation of the Sherman Act had been established. The instruction was proper as pertaining to the "in commerce" theory. It does not touch the "affect commerce" theory.

■ The trial judge, after summarizing the allegations of the indictment on interstate commerce which were the basis for the government's "in commerce" theory, (par. 12 to 17 incl. thereof; see note 1) then charged the jury as follows in instruction No. 25:

"* * * if you find these allegations as to commerce to be true, and if you further find beyond a reasonable doubt that the defendants agreed in advance of the shipment of these supplies into the state of Nevada to fix the prices at which they would be distributed and sold after the completion of that interstate journey, then I instruct you that such fixing of prices necessarily affected the free and untrammeled flow of such supplies while they were still in interstate commerce * * * ."

This instruction fitted into the plan of instruction on the "in commerce" theory. But because it stated that price fixing necessarily affected commerce it did not leave to the jury the factual question of the impact of wholly intrastate activities on interstate commerce and hence is not available as presenting the "affect commerce" theory.

■ The trial judge then gave instruction No. 26.[7] This was a proper instruction as part of the instructions on the "affect commerce" theory—but it is the only instruction on such theory.

Government counsel now argue the effect of these instructions as follows:

" * * * Thus there was left to the jury the factual question of whether the defendants agreed in advance of the shipment of the supplies into Nevada to fix the prices at which they would be distributed and sold after the completion of that interstate journey. If the jury so found, and if the jury further found the trade and commerce allegations to be true, said the court in effect, then in such event it followed as a matter of law, the court instructed, that such fixing of prices necessarily affected the free flow of such supplies in interstate commerce * * * ."

■ Government counsel does not analyze his two alternate theories on which he seeks affirmance of the conviction below. True, a price fixing conspiracy which operates on or within the flow of interstate commerce affects that commerce as a matter of law. But a price fixing conspiracy at a purely local or intrastate level does not, as a matter of law, affect the flow of commerce. Whether a purely local or intrastate conspiracy unreasonably restrains interstate commerce is primarily a factual question, i. e. does the local price fixing conspiracy affect substantially the flow of interstate commerce? If the answer is yes, then only are we concerned with the effect of the price-fixing under the per se doctrine. In fact, unless there is a finding that the local and intrastate activities complained of and as alleged in the indictment, substantially affected interstate commerce, there is no jurisdiction in a district court over the alleged Sherman Act violation. Such a finding could only result from proper instructions and the jury verdict of guilty thereon.

It appears therefore that the court never presented by instructions the alternate theory of "affect" on commerce. This could have been done by instructions that if the jury found that interstate commerce terminated when the plumbing contractors received the supplies, and if the jury found that the plumbing contractors were engaged wholly in *intrastate* activities, then the jury should determine whether, nevertheless, appellants' activities as charged in the indictment, substantially affected interstate commerce in the manner and as charged in Sec. V of the indictment.[8]

7. "A combination may be in restraint of interstate trade and commerce within the meaning of the Sherman Act even through (though) the restraint is applied before the interstate journey beings (begins) or after it has ended.

"Prices fixed in advance to effect a product at the end of its interstate journey are an interference with that commerce, although, at the time the sale is actually made, the product originating in interstate commerce may actually have come to rest on the shelf of the 'retailer.' It is the agreement on prices, in advance, which constitutes the violations, not the sale at the price.

"In assaying price-fixing agreements, the test is not so much whether the effect is felt after the movement of the goods has reached the end of the interstate journey. The inquiry seeks the effect upon prices in the market. And if this effect be shown, it matters not that the movement has come to a halt within the state."

8. "The purpose, intent and necessary effect of the aforesaid combination and conspiracy has been and is to directly, unreasonably, arbitrarily and unlawfully restrain and obstruct the flow of plumbing and heating supplies in interstate commerce into Southern Nevada by:

"(a) Suppressing and eliminating competition among plumbing contractors in the sale, distribution and installation of plumbing and heating supplies by fixing both the prices of the supplies sold and the prices charged for the subsequent installation of these supplies;

"(b) Narrowing and restricting the market in which builders, owners and other consumers are able to purchase plumbing and heating supplies in Southern Nevada."

The Government may have had two strings to its bow, but it obviously failed to fasten one string. Since we hold that the "affect commerce" theory was never presented to the jury, by instructions, we do not consider rejected instructions.

■■■ There remains the question as to whether the appellants suffered any prejudice through the failure to instruct on the "affect commerce" theory, relied on by the Government.

This is not a situation where an indictment presents a single theory of guilt and where defendants' theory of defense thereto, was not submitted to the jury. Such would, of course, be error.

This is a case where the Government proceeded on two alternate theories relating to (1) matters complained of in the flow of commerce, and (2) matters complained of in intrastate commerce substantially *affecting* interstate commerce after the flow in commerce had ceased. Either theory properly presented to the jury would support a conviction on the facts of this case. The appellants contended that their activities were wholly intrastate and had in fact no substantial effect on interstate commerce and that their acts were done after the flow of goods in commerce ceased.

This contention, if found by the jury to be true, would be a defense to a prosecution on either the "in commerce", or the alternate "affect commerce" theory. But under proper instructions given on the "in commerce" theory, the jury found a continuous and uninterrupted flow of commerce through the plumbing contractors as conduits, to the places of installation of the plumbing supplies in southern Nevada and further found that appellants conspired to fix prices and to divide the market, per se violations, which as a matter of law, affected the flow of commerce and con-victed appellants. The appellants cannot complain, since they have not been hurt.

### Substantial effect on interstate commerce

■■■ Government counsel argue that it was plainly not for the jury to decide whether a per se violation such as price fixing has a necessary effect upon commerce; that price fixing at any level necessarily affects interstate commerce as a matter of law and that the law conclusively presumes such an effect.

Assuming an "in commerce" situation, we can agree. But when the "affect" on commerce theory is presented, it is clearly a question of fact whether wholly intrastate activities affect interstate commerce in a manner proscribed by the Sherman Act. After this question is decided, then the *per se* doctrine may well apply.

Appellants argue that the effect on interstate commerce of the acts complained of, must be substantial. They contend also the question of substantiality should have been submitted to the jury. The question should have been submitted on the "affect commerce" theory. But we are now concerned with only the "in commerce" theory remaining in the case.

■■■ The test of the impact on commerce is qualitative not quantitative * * * "§ 1 of the Act brands as illegal the character of the restraint not the amount of commerce affected." U. S. v. Socony-Vacuum Oil Co., 310 U.S. 150, 225, ft. note 59, 60 S.Ct. 811, 845, and cases cited therein.

■■■■ On the facts of this case discussed heretofore, the restraint was substantial. The jury found by its verdict that the defendants, as charged in the indictment, had engaged in an illegal conspiracy to fix the price of and divide the market for plumbing and heating supplies, violations per se[9] "flowing" in

---

9. "Violation per se" means that the acts complained of constitute a violation regardless of the alleged reasonableness of the restraint which is affected thereby or the facts which are offered in justification of the restraint. As a matter of law the per se violation has an effect on com-

the stream of interstate commerce. The proscribed and substantial effect of these illegal acts followed as a matter of law. Ethyl Gasoline Corp. v. U. S., 1940, 309 U.S. 436, 458, 60 S.Ct. 618, 84 L.Ed. 852; U. S. v. Trenton Potteries Co., 1927, 273 U.S. 392, 47 S.Ct. 377, 71 L.Ed 700.

▬ The appellants complain that certain of the instructions dealt with elements of the case such as price fixing without reference to the relationship which should exist between such activities and interstate commerce to establish a violation of the Sherman Act. Later instructions fully covered this aspect of the case. The instructions given to the jury must be read together. No one instruction presents all the law pertaining to the case. We find no error.

### IV.

### The Instructions on the Presumption of Innocence

Appellants complain of a portion of instruction 4 given to the jury. "The defendants are presumed to be innocent at all stages of the proceeding, until the evidence introduced on behalf of the government shows them to be guilty beyond a reasonable doubt."

Appellants have not complied with Rule 18(2) (d) of this court, supra. But searching the record for the objection before the trial judge, we find:

"Instruction #4, we object to that on the ground it states the issue negatively, and further the defendants are entitled to an affirmative statement and a more comprehensive statement thereof." Appellants urge the effect of the instruction was to require the jury to discard the presumption of innocence if at any time during the trial they might find the appellants · guilty beyond a reasonable doubt.

▬ Such objection was not made before the trial judge. The purpose of requiring objections after instructions are given is to permit a trial judge to correct erroneous instructions.

▬ Appellants' requested instruction #3, (not given by the court) reads: "A defendant in a criminal action is presumed to be innocent until the contrary is proven * * *".

Appellants' present arguments could apply as well to their own requested instruction. Counsel for defendants in a criminal action cannot play fast and loose with the trial judge and then complain of error on appeal.

The court, at the outset of the trial, thoroughly indoctrinated the jury as to the presumption of innocence.

"The defendants and each of them are presumed to be innocent at all stages of this trial, unless that time arrives, if it does arrive—it may not arrive—that the evidence in the case should convince the jury, or a member of the jury, that one or all of the defendants is guilty. Then, of course, the presumption of innocence no longer exists * * *. This presumption of innocence is a strong, substantial living thing and it is the bulwark of our liberty in this country. It is the thing that makes our country stand out as the one place remaining where we have liberty. Take away this presumption of innocence and you have at one fell swoop destroyed all of our government * * * I think it is the most important thing that we have, and I want each member of the jury to have that view of it and to require the government to prove its case beyond a reasonable doubt. If the government fails to prove every material element of the charge against each of these defendants,

merce. "Violation per se" does not mean (as the government contends) that the acts complained of, to-wit, a conspiracy to fix prices and divide the market, automatically and illegally *affect* interstate

commerce in a case where such intrastate activities are alleged to have an "effect" on the interstate flow of commerce. This is a question of fact.

750

the defendant against whom that has not been proved is entitled to be acquitted, and any defendant against whom the government has not maintained or accomplished its burden, is to be acquitted * *."

 An instruction similar to the one complained of was held not erroneous in: Allen v. U. S., 1896, 164 U.S. 492, 500, 17 S.Ct. 154, 41 L.Ed. 528.

See Agnew v. U. S., 1897, 165 U.S. 36, 51, 17 S.Ct. 235, 41 L.Ed. 624; Holt v. U. S., 1910, 218 U.S. 245, 253, 31 S.Ct. 2, 54 L.Ed. 1021; Mullaney v. U. S., 9 Cir., 1936, 82 F.2d 638.

Compare the brief instruction in Canella v. U. S., 9 Cir., 1946, 157 F.2d 470.

On the whole record we find no error in the instruction given.

## V.

### The Alsup Appeal

Alsup has filed separate briefs and in addition relies on the briefs filed in behalf of the other appellants.

**(A) *The sufficiency of the indictment as to Alsup***

 Alsup contends that the facts alleged in the indictment were insufficient to constitute an offense against the laws of the United States insofar as he was concerned. He contends "the only portions of the indictment referring to * * * Alsup appear in paragraph 7 and 19 * * *". Paragraph 7 lists Alsup as an indicted co-conspirator and 19(f) alleges that to secure compliance with the plan to fix prices and allocate bids, Alsup would induce plumbers not to work for any contractor other than the one designated under the plan.

But Alsup as an indicted co-conspirator was charged with having "*conspired*" and taking the allegations of the indictment as true for the purposes of his contention, a crime was clearly charged against him. The unlawful conspiracy was the gist of the crime.

Paragraph 19(f) of the indictment was merely a part of the description of how the unlawful plan would operate.

The charge against Alsup does not rest merely on paragraphs 7 and 19, but upon the whole of the indictment.

The sufficiency of the indictment to charge an offense under the Sherman Act has been considered heretofore.

**(B) *The sufficiency of the evidence to support the conviction as to Alsup***

 Alsup raises the contention that the evidence was not sufficient to support his conviction, but the record shows his active participation in the conspiracy from its inception in mid-August of 1950. He was present and participated in the first meeting between the plumbing contractors, when the organization and the setting up of an estimator was discussed. Bates, a plumbing contractor present at the meeting testified that he said to Alsup that he "did not see how the deal could be made to work." Alsup replied that he thought "we will have something that will work this time." He said he was in a position where if the people did not go along with him he was in a position to get them to comply. The evidence shows further that Alsup forbid journeymen plumbers, employees of Ritter, a contractor, to work for Ritter until he promised to withdraw a bid which he had given out of line with the purpose of the conspiracy. In addition, Sylvester, an outside plumbing contractor who was awarded a plumbing contract on the Las Vegas race track went to Alsup's office to obtain men. Two of the plumbing contractors, appellants herein, attempted to get him to back out of the deal. In Sylvester's presence they asked Alsup to protect them. Alsup readily furnished plumbers to Sylvester on another project for the Atomic Energy Commission at the same time he refused to furnish plumbers to work at the race track. The jury could rightfully infer, and so did, that Alsup's actions were in answer to the pleas of the plumbing contractors that they be protected.

The charge is conspiracy and the gist of the crime is the unlawful agreement.

The evidence was sufficient to warrant the verdict against Alsup.

### (C) *There were no errors in the admission or rejection of evidence as to Alsup*

Alsup contends that the admission of the testimony given by Hansen of a conversation had with Swan (the estimator) was error. Swan told Hansen to contact his office with the proposition that another plumbing company get a certain contract.

Swan was employed as the estimator by the appellants. He prepared material for their bid making and kept a record of which plumbing contractor got the business. He was either a co-conspirator, though not indicted, or the agent of the appellant co-conspirators. His statement to Hansen was in furtherance of the conspiracy.

Appellants' attorney at oral argument conceded Alsup was the agent for the defendant co-conspirators. Swan's conversation as testified to by Hansen was either in furtherance of the conspiracy (if he was a co-conspirator) Clune v. U. S., 1895, 159 U.S. 590, at page 593, 16 S.Ct. 125, 40 L.Ed. 269; U. S. v. Harrison, 3 Cir., 1941, 121 F.2d 930, 934, certiorari denied 314 U.S. 661, 62 S.Ct. 124, 86 L.Ed. 530, or within the scope of his agency for the defendants and in furtherance of the conspiracy (if he was only their agent).

The rule of criminal agency, although not as broad as in civil cases, applies in criminal cases. If there is sufficient evidence and the jury concludes that the acts of the agent were done with appellants' "authority and under [their] direction," Pearson v. U. S., 9 Cir., 1945, 147 F.2d 950, 952, the agents' acts bind the appellants as principals. U. S. v. Perillo, 2 Cir., 1947, 164 F.2d 645; U. S. v. Gooding, 1827, 12 Wheat. 460, 468, 469, 6 L.Ed. 693; Goldsmith v. U. S., 2 Cir., 1930, 42 F.2d 133, 138, 139, certiorari denied 282 U.S. 837, 51 S.Ct. 26, 75 L.Ed. 743.

Here there was clear evidence of the agency.

The supposed distinction between the acts of a co-conspirator and those of an agent in a criminal case, is in reality one without a difference. The basic rule is that "the acts of any agent, within the scope of his authority, are competent against his principal." U. S. v. Olweiss, 2 Cir., 1944, 138 F.2d 798, 800. Thus in either situation the evidence was properly admitted.

Krulewitch v. U. S., 1949, 336 U.S. 440, 69 S.Ct. 716, 93 L.Ed. 790, relied on by Alsup, held that an admission of a co-conspirator, not in furtherance of the conspiracy, was not admissible. This rule does not aid the appellant, Alsup.

The same result would follow as to the same conversation between Swan and Hansen as testified to by witness Anderson who listened in on a phone extension. Alsup also alleges error in excluding evidence and relies on the briefs of the other appellants. Such a point is not discussed by the remaining appellants.

### (D) *Alsup's status as a business agent for a labor Union does not give him immunity from prosecution*

Alsup contends that his status as a business agent for a labor Union, makes him immune from prosecution.

Labor Unions, their members and officials enjoy no all-inclusive exemption from prosecution under the Sherman Act.

Cases relied on by Alsup show that if Unions combine with non-labor groups, U. S. v. Hutcheson, 312 U.S. 219, 232, 61 S.Ct. 463, 85 L.Ed. 788, or aid and abet business in a violation of the Act, Allen Bradley Co. v. Local Union No. 3, 325 U.S. 797, 801, 65 S.Ct. 1535, 89 L. Ed. 1939, they come within the prohibition of the Sherman Act.

Apex Hosiery Co. v. Leader, 1940, 310 U.S. 469, 60 S.Ct. 982, 84 L.Ed. 1311, relied upon by Alsup was a case where Union defendants were acting on their own without concert with business interests and is hence distinguishable from

the case at hand. There is no merit to this contention.

Numerous other alleged errors are assigned and discussed but we find the contentions to be without sufficient merit to immortalize them by discussion, and thus add pages to already crowded law libraries. The judgments are

Affirmed.